Elvis E. JOHNSON, Plaintiff,

v.

Robert E. SAWYER, Dale V. Braun, Sally Sassen, Robert G. Stone, William J. Kurak, Michael Orth, Charles Peterson, Robert M. McKeever, and the United States of America, Defendants.

Civ. A. No. H–83–2173.

United States District Court,
S.D. Texas,
Houston Division.

April 3, 1991.

Robert I. White, Larry A. Campagna, Houston, Tex., for plaintiff.

Hayes Jenkins, Houston, Tex., Michael J. Salem, Washington, D.C., for defendants.

## OPINION

SINGLETON, Senior District Judge.

### INTRODUCTION

Plaintiff brings this action against the United States and various employees of the Internal Revenue Service for the unauthorized disclosure of confidential tax information. The Court has jurisdiction of Plaintiff's claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* Those claims have been tried to the bench; the claims against the individual Defendants, which arise from 26 U.S.C. § 6103, have not been tried. As will be seen, however, disposition of the claims against the United States requires the examination and appraisal of the actions of some of the individual Defendants, so that some matters pertaining to the individual Defendants will in fact be decided now.[1]

### FACTS

Johnson seeks damages for actions that resulted in the demise of what had been a very successful career.

After serving with distinction in the United States Army Air Corps during the Second World War, Johnson returned to his home state of Missouri, received a degree in Business Administration, and married. In the early 1950s he went to work selling insurance for a general life insurance agency (the "General Agency") owned and operated by his brother in Springfield, Missouri. The American National Life Insurance Company of Galveston, Texas ("American National") had established the General Agency, which sold only policies issued by American National. Johnson quickly proved to be an outstanding insurance salesman. He soon led the General Agency in dollar volume of insurance sold, moved on to lead the entire state in volume of American National insurance sold, and, during much of the 1950s and 1960s, sold more insurance than any other salesman connected with American National anywhere. Upon the death of his brother in 1965, Johnson became the sole owner of the General Agency. In 1968 American National placed him in charge of all of its sales activity in Missouri; the following year it appointed him Associate Regional Director of its Midwest region, which included the states of Missouri, Kansas, Oklahoma, Arkansas, and a slice of Texas. Johnson continued to direct his General Agency, which by 1972 had become the most productive general agency in the history of American National.

In 1972 Johnson's career made a major advance. American National invited him to join its home office in Galveston, where it had created a position for him as understudy to American National's world-wide director of sales of ordinary life and health insurance. Johnson and his wife moved to Texas in 1972. Two years later they bought a home at 25 Adler Circle in Galveston.

After the move to Texas, Johnson's career continued to prosper. He became the director of sales of American National's four hundred and fifty to six hundred general agents across the country and worldwide, was promoted to Senior Executive Vice President of American National, became Chief Marketing Officer, and was named to the Board of Directors. The Court has no reason to question Johnson's assertion that at the time of the events which form the basis of this action he was in line to become the next CEO and Chairman of the Board of American National.

At this point we must digress to discuss the methods Plaintiff developed to keep track of his business finances, for it was from certain irregularities in those methods that the events stemmed which form the basis of this action.

---

1. This opinion incorporates by reference our memorandum and order in *Johnson v. Sawyer*, 640 F.Supp. 1126 (S.D.Tex.1986), which dealt with several issues on which the parties sought summary judgment. The Government appealed the order, then withdrew the appeal (file, instruments no. 93 and 95).

Plaintiff observed that after the death of his brother in 1965, his brother's widow found herself completely bewildered by the task of compiling the records necessary to prepare the income tax return covering the final year of her husband's life. Plaintiff determined that his wife would not be left in such a position, and decided to teach her the record keeping procedures that he had learned from his brother while working for him in Springfield. We describe those procedures in some detail.

Upon Plaintiff's return home every day, he informed Mrs. Johnson of his expenses for that day—gasoline, meals, parking, and so forth, some documented by receipts, some not. Mrs. Johnson recorded these expenses, including date, payee and purpose, as well as amount, in daily summary sheets, which Mr. Johnson, usually over the following weekend, copied into a bound "diary book". The week's summary sheets were then discarded.

At the end of each month, Plaintiff and his wife transcribed the information from the diary book onto accounting spreadsheets. Each spreadsheet was divided into columns, one for each category of expenditure. As Plaintiff assumed more responsibility within the General Agency and began to travel more, the categories of expenditure expanded to include such items as hotel bills, entertainment expenses, gifts to agents, commissions to subagents, and various other items. After listing all this information on the spreadsheets for a given month, Plaintiff and Mrs. Johnson totalled each column and attached the adding machine tapes to the spreadsheets. Once each year they prepared an annual spreadsheet which showed both the totals for each month, and the annual total in each category. This annual spreadsheet was then given to the accountant who prepared the Johnsons' tax return; they retained the diary book and the monthly spreadsheets.

After Plaintiff and Mrs. Johnson moved to Galveston, his traveling and entertaining responsibilities increased greatly. Plaintiff traveled outside of Texas an average of four days out of each week, and sometimes traveled abroad. Much of his time was given to entertaining, not only while traveling, but also at the home office, because the religious convictions of the president of American National did not permit him to sponsor entertainment functions that involved the use of alcohol. Johnson had an unlimited business expense account, and had the right to reimbursement from the Company for all travel expenses, both for him and his wife. Sometimes, however, he incurred business expenses for which he did not seek reimbursement, and those expenses were, of course, tax deductible.

Plaintiff and his wife kept track of his increasingly heavy travel expenses by employing the accounting methods they had used in Springfield, with some modifications.

Each week the Johnsons reviewed Plaintiff's traveling for the prior week. In a typical trip of several days, Plaintiff would have visited one or two towns each day, would have traveled either commercially or in the company plane, and would have been in business meetings from early morning to late evening each day, including mealtimes. Plaintiff told Mrs. Johnson how much money he spent on the trip. His travel expenditures took three forms: (1) he spent some of the cash he set out with; (2) he wrote checks; (3) he used credit cards. Plaintiff gave his wife the receipts from the past week's traveling, and she recorded the travel expenses on the daily summary sheets under the same categories that she had used in Springfield. The daily summary sheets could not be completed, however, until the Johnsons had received the credit card bills covering the period in question. After the bills had come in and she had completed the daily summary sheets, Mrs. Johnson gave them to Johnson, who transcribed them into the bound diary book. At that point the daily summary sheets were discarded, but Mrs. Johnson attached the receipts for the period in question to the bound diary book. As before, the contents of the diary book were transcribed onto monthly spreadsheets, which were in turn transcribed once each year onto a final spreadsheet for use by the Johnsons' accountant in preparing their tax return.

Mrs. Johnson retained copies of all credit card invoices.

Unfortunately, Mrs. Johnson employed, on several occasions, recording and reporting procedures that resulted in discrepancies between the business expenses shown in the records and the expenses claimed as deductions. There is no evidence whatever that in so doing she was motivated by any duplicitous intent, nor that her husband knew what she was doing before he learned that the IRS was investigating him. Mrs. Johnson's procedural peccadilloes were of three kinds.

First, if she knew, while working up the daily summary sheets for the previous week, that Johnson had spent a certain amount of cash on business expenses, but she did not know exactly how that cash disbursement should be broken down—that is, exactly how much of it had been spent for what, and where—she would sometimes, instead of listing that cash on the summary sheet, list an equivalent amount that had been spent on a personal expense with a credit card. For example, she once, knowing that he had previously expended about $160 in business expenses, listed in the daily records the purchase by Johnson of a $160 lawnmower for her father. When the time came for Johnson to prepare the bound diary, she dictated to him the amounts she had listed in the daily records, and he would write them down without knowing that some of them represented personal expenses. Mrs. Johnson evidently felt that as long as the amounts of disbursements recorded accurately represented the amounts Johnson had expended for business purposes, the actual nature of a given recorded disbursement did not matter. The end result of this procedure was that Johnson took business deductions for personal expenses.

Second, Mrs. Johnson occasionally altered a credit card receipt by increasing the amount it showed to cover a cash disbursement that she was not sure how to record. If, for example, Johnson had paid $50 by credit card for a hotel room and had also expended $100 in cash, she would alter the credit card receipt by writing in a one in front of the fifty, thus increasing the total on the receipt from $50 to $150, instead of directly recording the $100 cash on the summary sheet. As always, she would then dictate the amount listed on the summary sheet to Johnson and he would enter it in the bound diary. The end result of this procedure, of course, was that Johnson claimed business deductions in excess of what the credit card receipts, whose alteration was apparent to the practiced eye of the IRS, actually showed.

Third, Mrs. Johnson often allocated a cash disbursement among the various categories of expenditure somewhat arbitrarily, not knowing precisely how it had been spent. Hence the breakdown of a given period's expenses into categories—"gifts and prizes to agents", for example—often could not be correlated with Johnson's activities at that time. It is evident, and deserves emphasis, that at all times Mrs. Johnson's reporting was scrupulously accurate as to amounts expended; the weakness of her approach was that she did not recognize the importance of attributing expenses to their proper source. The evidence showed that Johnson neither had knowledge that his wife was using nonbusiness credit card receipts to attempt to substantiate currency disbursements he made for other purposes, nor that she was altering credit card receipts to attempt to document currency disbursements actually made for other purposes, nor that she was arbitrarily allocating disbursements among the categories of expenditure.

In the late 1970s the IRS began to look into the Johnsons' tax returns for the years 1972 through 1975. The examiner looked into the bound diary books, the monthly and annual spreadsheets, and credit card bills and invoices. Doubtless it was not long before the discrepancies due to Mrs. Johnson's handling of the credit card purchases bobbed to the surface.

The examining agent referred the matter to the IRS Criminal Investigation Division, which assigned the case to Defendant

Stone.[2] Johnson did not tell the IRS personnel investigating his case that the discrepancies between his records and his deductions were due to Mrs. Johnson's well-meaning but eccentric procedures, because he was afraid that disclosure of her part in the affair might result in her prosecution. Defendant Stone recommended that Johnson be prosecuted for tax evasion; Defendants Kurak, Orth and Sawyer concurred. IRS District Counsel in Houston reviewed the case, as did the Washington, D.C. office of the Department of Justice. In the course of the review, Johnson passed two polygraph tests; he offered to take further polygraph tests, to be administered by any person or law enforcement agency the Government might choose; the Government declined his offer. Ultimately the Department of Justice recommended that Johnson be prosecuted under 26 U.S.C. § 7201 for tax evasion for the years 1974 and 1975. The case was assigned to Assistant United States Attorney James Powers ("Powers") in the Houston office of the United States Attorney for the Southern District of Texas.

After Mrs. Johnson had disclosed her part in the matter by submitting to a deposition at the office of the U.S. Attorney, Powers offered the Johnsons a plea bargain. If Johnson would plead guilty to a one count information charging tax evasion, Mrs. Johnson would not be bothered further; otherwise, both Johnsons would be subject to indictment. As part of the plea bargain, Powers agreed to several measures designed to keep the prosecution from becoming publicly known:

(1) all papers filed in the case would give plaintiff's name as "Elvis Johnson" rather than "E.E. 'Johnny' Johnson", by which he is normally known;

(2) papers requiring Johnson's street address would give it as 1100 Milam Street in Houston, which was the address of his attorney, and no reference to his address at 25 Adler Circle, Galveston would be made;

(3) the Government would seek to have the presentence investigation completed before the criminal information was filed so that the probation officer's recommendation could be made known to the judge by the time the information was filed;

(4) the information would be filed late on a Friday afternoon, and the case would be brought before the judge immediately, so that arraignment and sentencing could be completed that same afternoon; and

(5) the U.S. Attorney's office would publish no press release.

Powers also agreed to recommend probation, and not to oppose a plea of nolo contendere.

On the afternoon of Friday, April 10, 1981, the Government filed a criminal information charging Johnson with attempting to evade taxes due on his 1975 return.[3] In chambers the judge stated that he would not accept a nolo plea, but would be satisfied with probation. In the courtroom, in

---

2. The case was initially assigned to another agent, and reassigned to Stone.

3. The information read as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA
VS.
ELVIS JOHNSON
CRIMINAL NO. G-81-2

CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES:
That on or about April 15, 1976, in the Southern District of Texas, the defendant ELVIS JOHNSON, a resident of Galveston, Texas, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States for the calendar year 1975, by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, in the Galveston Division of the Southern District of Texas a false and fraudulent income tax return, which was filed with the Internal Revenue Service, wherein he stated and represented that his taxable income for said calendar year was $53,589.00 and that the amount of tax due and owing thereon was the sum of $18,374.50, whereas, as he then and there well knew, his taxable income for 1975 was $59,784.18 upon which said taxable income he owed to the United States an income tax of $21,849.47. (Violation: Title 26, United States Code, Section 7201).

CARL WALKER, JR.
United States Attorney
By:
JAMES L. POWERS
Assistant United States Attorney

which no spectators were present, Johnson pleaded guilty and received a probated sentence; no fine was imposed. Plaintiff's counsel had ensured that members of the press neither viewed the papers filed nor attended the courtroom proceedings. As Johnson entered the weekend of April 11 and 12, 1981, he had good reason to believe that he had handled a difficult situation in the most sensible way possible, and that he had, though at the cost of pleading guilty to a crime of which he did not feel himself guilty, protected both his wife and his career.

The dam broke on Wednesday, April 15, 1981. Two officers of American National informed Johnson that a Galveston journalist had called them to make inquiries about Johnson's conviction, about which he had learned from an IRS news release. The American National officer obtained a copy of the IRS release from the journalist and showed it to Johnson. It read as follows:

INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE

GALVESTON, TEXAS—In U.S. District Court here, Apr. 10, Elvis E. Johnson, 59, plead [sic] guilty to a charge of federal tax evasion. Judge Hugh Gibson sentenced Johnson, of 25 Adler Circle, to a six-month suspended prison term and one year supervised probation.

Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns.

In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest.

Needless to say, Johnson got in touch with his attorney, who immediately called Powers. Powers stated that he had known nothing of the IRS news release, that he had made no news release himself, and that if the Johnsons had been damaged by the news release, they should "sue the hell out of them" (tape of the phone conversation—Plaintiff's Exhibit 43).

It is obvious that no one even casually acquainted with Johnson, in either a business or a social connection, could possibly read this item without realizing whom it was about. The release gave Johnson's residential address in Galveston, described his position with American National, gave his middle initial, which under the terms of the plea bargain was not to be mentioned, and gave his age. It also falsely stated that Johnson had pleaded guilty to offenses involving both his 1974 and 1975 tax returns, when in fact, pursuant to the terms of the plea bargain, the criminal information mentioned only the 1975 return. Finally, it gave the impression that he had admitted to altering documents and falsifying deductions.

The IRS mailed the news release to at least twenty-one news media outlets in the Galveston area. As a result of the remonstrations of Johnson's attorney, the IRS informed those outlets that the release might contain errors and asked them to put a hold upon it. On April 17, 1981, the Austin office issued a second news release, over the strenuous objections of the attorney, who warned IRS officials that it could only compound their liability. The April 17 release read as follows:

INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE

GALVESTON, TEXAS—In U.S. District Court here, Apr. 10, Elvis E. Johnson, 59, plead [sic] guilty to a charge of federal tax evasion. Judge Hugh Gibson sentenced Johnson, of 25 Adler Circle, to a six-month suspended prison term and one year supervised probation.

Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with willful evasion of federal tax by filing a false and fraudulent tax return for 1975.

In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest.

Johnson had long since made the fact that he was in difficulties with the IRS known to a few of his closest associates. They understood the freakish basis of his

tax troubles and were entirely satisfied that he should carry on with American National as before, provided only that there was no public scandal. Within a few days of the April 17 release, however, Johnson was asked to resign from his position in Galveston. He sold his house and returned with his wife to Springfield, where he continued to work for American National in a subordinate role until his retirement.[4]

We now trace again, but in greater detail, and with emphasis upon the actions of some of the individual defendants, the events of Friday, April 10, 1981, when Johnson appeared in court, through Friday, April 17, 1981, when the second news release went out. First, however, we list the individual Defendants and their positions in the IRS at the time; not all of them will be discussed here.

Robert Stone was a Special Agent in the Criminal Investigation Division of the Office of the District Director for the Austin District; he worked in Houston.[5]

Sally Sassen was the Public Affairs Officer of the Austin District; she worked in Austin.

Michael Orth was the branch chief for the Criminal Investigation Division in Houston.

William Kurak was the group manager in the Criminal Investigation Division in Houston. Stone reported to Kurak; Kurak reported to Orth.

Robert Sawyer was chief of the Criminal Investigation Division for the Austin District; he worked in Austin.

Dale Braun was assistant chief of the Examination Division of the Austin District, but he figures in this action because at the time of the events complained of he was serving as the acting district director for the Austin District.

Robert McKeever was the district director of the Austin District.

The function of Charles Peterson is not clear from the pleadings, but Ms. Sassen stated that he was chief of the Taxpayer Service Division (Sassen, 6:25).[6] Although Plaintiff's corrected proposed findings place him in Austin at the time in question, he stated that he worked in Houston (Peterson, 3:13).

Stone recalled that he had had a phone conversation with Powers, "either late Friday or early Monday morning" (Stone, 6:11). Stone asked Powers to tell him what happened at the courthouse on Friday. He stated distinctly that he made clear to Powers that the information was needed "for our news release purposes ..." (Stone, 7:1); he also stated that Powers told him that the criminal information covered both 1974 and 1975 (Stone, 7:9). The conversation lasted fifteen or twenty minutes; Stone recalled that Powers mentioned a plea bargain, but didn't think they discussed it in any detail (Stone, 9:1). On Monday morning, after he had talked to Powers, Stone phoned Sally Sassen to give her the information necessary to prepare the news release (Stone, 13:1). (Sassen, 37:14).[7]

Sassen promptly wrote up a news release, apparently on the sole basis of the information given her by Stone; by her

---

**4.** Because Johnson was moved from an executive to a field position, company rules obligated him to retire at the age of sixty-five instead of seventy.

**5.** At that time, the Austin District included the cities of Houston and Galveston.

**6.** The depositions of the individual Defendants will be cited by name, page, and first relevant line. The preceding citation refers to the deposition of Sally Sassen, beginning page 6, line 25.

**7.** Section E, subsection 5, of the District Director's memorandum of October 15, 1980, states:

"In the post-litigation actions, e.g., pleas of nolo contendere or guilty, or verdicts and sentencing, the DPAO [District Public Affairs Officer] will draft a news release based on information furnished by the investigating Special Agent. The investigating Special Agent will provide the DPAO with taxpayer's age, occupation, home address, and other pertinent facts. Immediately after the legal action is completed, the investigating Special Agent will telephone the DPAO with additional information to complete the news release."

own admission, she made no effort to ascertain what information was in the public record (Sassen, 33:21, 38:16, 39:3, 41:12, 52:13), or to check the accuracy of Stone's information in any way. She further testified that in the public affairs officers training course she took in Chicago she was instructed that in preparing a news release she was "to rely on the information of the special agent and also to get a supervisory approval from someone in the Criminal Investigation Division ..." (Sassen, 42:14) and that her predecessor in the Austin office trained her to make releases without personally verifying their correctness (Sassen, 41:18). Furthermore, when Stone called Sassen she did not know him, know his voice, or know (until he told her) that he was a special agent, nor had she heard of the Johnson case (Sassen, 63:24). It would appear that anyone could have called her and instigated a press release about an individual of whom she had never heard.

Having drafted the news release, Sassen phoned Stone and read it to him (Sassen, 66:14). Sassen had no recollection of his response; Stone testified that he "would have answered in the affirmative, that it appeared to be accurate" (Stone, 15:6).

Stone testified that after Sassen read the release to him he in turn reviewed it with Powers, who approved it (Stone, 26:12, 27:7), and that he then called Sassen back to inform her that Powers had approved it (Stone, 27:12).

Sassen next called Orth, read him the release, and obtained his approval, though she could not recall his exact words (Sassen, 68–70:1). In his deposition Orth could not remember if he had called the U.S. Attorney's office to clear the release, although he was sure that that was "somebody else's responsibility" (Orth, 12:10).[8]

There was no requirement that the release be cleared by Sawyer, who was Orth's chief (Orth, 20:25–21:16).

Sawyer first learned of the matter on April 16, when another IRS official (not a party to this case) told him that he had just received a call from Johnson's lawyer. (Sawyer, 8:3). Sawyer called in Orth, who happened to be visiting the Austin office; while they were discussing the matter they received a telephone inquiry from Dale Braun, who had also gotten a call from the lawyer. Sawyer and Orth called Kurak and Stone and asked them to get a copy of the criminal information.

Sawyer and Orth next met with Braun and Sassen (Sawyer, 11:7) and placed a conference call to Harold Friedman and James Mullins, two attorneys in the Houston office. Friedman had received a call from Johnson's lawyer, and advised that the press release be retracted (Sawyer, 12:18).

As the reader already knows, the upshot of all this activity was the issuance of a second press release, which Friedman had advised against (Sawyer, deposition exhibit # 1).

## FTCA PROBLEMS

The Federal Tort Claims Act, which provides the waiver of sovereign immunity necessary to bring suit against the United States, creates no causes of action, *Feres v. United States*, 340 U.S. 135, 141, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950), and, as this Court recognized in its summary judgment memorandum, an FTCA claim must be based on a state law cause of action. *Johnson v. Sawyer*, 640 F.Supp. at 1137.[9]

---

8. Although Orth stated (12:18–19) that IRS procedures would not have permitted him to call the U.S. Attorney, the passage taken as a whole clearly shows that he meant to say that IRS procedures would not have required him to do so. Orth, 12:10–13:5, 19:13–16.

9. Section 6103 prohibits the disclosure of tax returns and return information. We have already held that the issuance of the release violated § 6103 and that "a reasonably competent IRS official should have known that that disclosure was illegal." *Johnson v. Sawyer*, 640

F.Supp. at 1134. At the time of the events complained of, actions for violations of § 6103 were governed by 26 U.S.C. § 7217, which permitted suit only against the individual violator, not against the United States. *Johnson v. Sawyer*, 640 F.Supp. at 1137. Section 7217 was repealed effective September 3, 1982 and replaced by 26 U.S.C. § 7431, which authorizes suit against the United States, but not against the individual violator. *Mid–South Music Corp. v. Kolak*, 756 F.2d 23, 25 (6th Cir.1984).

Johnson asserts several causes of action grounded in Texas law: (1) *respondeat superior;* (2) negligent supervision of employees; (3) breach of a confidential relationship, and (4) violation of the right of privacy. Before applying that law to the facts of the case, however, we must first address the Government's contention that two provisions of the FTCA bar this action.

(a) *Discretionary Function Exception*

■ 28 U.S.C. § 2680(a) exempts from coverage under the FTCA any claim

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

A careful reading of § 2680(a) reveals that it sets forth two distinct exceptions to the FTCA. *Lively v. United States,* 870 F.2d 296, 297 (5th Cir.1989). The first exempts claims based upon the execution of a statute or regulation, provided that the employee exercised due care. This clause need not detain us; whether the individual Defendants were acting in the "execution of a statute or regulation" within the meaning of § 2680(a) or not, some of them certainly did not exercise due care. The second exempts claims based upon the performance or non-performance of a discretionary function, whether the discretion was abused or not. If § 2680(a) is applicable to this case, it can only be because each of the individual defendants performed, or failed to perform, a discretionary function.

We trust that no reader will demur if we state that the concept of discretionary function is a difficult one, which continues to elude precise definition after many years of struggle by the federal courts. Cf. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984) (impossible "to define with precision every contour of the discretionary function exception"); *Federal Deposit Ins. Corp. v. Irwin,* 916 F.2d 1051, 1053 (5th Cir.1990) ("decades of litigation have yet to yield a clear demarcation between actionable torts and immune discretion ... [i]mprecision appears inevitable."). Nevertheless, although the waters in this area are murky, they are not opaque, and we have been given sufficient guidance from the courts above to determine that the discretionary function exception does not apply here.

The Government's position verges upon the assertion that any act of a governmental employee that involves discretion, as that word is used in common parlance—that is, as a synonym for choice—falls within the ambit of § 2680(a). Common sense and case law unite to reject such an interpretation, which would leave very little of the FTCA standing. The Fifth Circuit noted two years ago that its

> decisions ... have been extraordinarily careful to avoid any interpretation of the discretionary function exception that would embrace any governmental act merely because some decision-making power was exercised by the official whose act was questioned.

*Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1484 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). As Judge Brown stated in a characteristically colorful concurrence in *Collins v. United States,* 783 F.2d 1225, 1233 (5th Cir.1986),

> [e]very act of a rational being involves some choices—speed up or slow down, turn right or left, put helm port or starboard, go full astern or full ahead, tighten brakes or replace them, glide in or circle, use general anesthetic or local, use a human heart or a JARVIK 7. It is plain that the discretionary function exception of section 2680(a) must be applied with restraint if the Tort Claims Act is to achieve the ... purposes which motivated its enactment ... [u]nless section 2680(a) is read carefully, it will insulate the Government from nearly all tort liability ...

We must not, therefore, assume that the actions of the individual Defendants fall within § 2680(a) merely because they were volitional in nature. Nor must we accept the Government's argument that (1) the decision of upper-echelon IRS officials to authorize the issuance of postconviction press releases was discretionary in nature, therefore (2) actions taken with regard to the issuance of a specific press release, being taken in furtherance of that discretionary directive from above, must themselves be discretionary in nature. We agree, for reasons to be elaborated *infra,* that the upper-level decision to issue postconviction press releases was discretionary. It does not follow, however, that actions taken at lower levels in furtherance of that decision share in its discretionary nature. The Fifth Circuit has addressed this point several times.

> Once the government makes a discretionary decision, the discretionary function exception does not apply to subsequent decisions made in the carrying out of that policy, "even though discretionary decisions are constantly made as to how those acts are carried out."

*Trevino, supra,* quoting *Wysinger v. United States,* 784 F.2d 1252, 1253 (5th Cir.1986). Ten years before *Trevino* the Circuit stated that

> the fact that the negligence may have occurred in connection with a discretionary function does not make the negligent act a discretionary function. Nor does the discretionary character of the government's initial ... undertakings govern whether a duty can arise out of those undertakings. The Tort Claims Act deals with sovereign immunity—that is, with whether the United States may be sued for certain torts; it does not define what are torts.

*Aretz v. United States,* 604 F.2d 417, 431 n. 18 (5th Cir.1979).

Still faced with the task of determining whether the actions of the individual Defendants fell within the discretionary function exception, we turn to the Supreme Court's most recent attempt to clarify the exception. For our purposes the heart of the opinion in *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) is the holding that

> assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield ... [t]he exception ... protects only governmental actions and decisions based on considerations of public policy ... the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

486 U.S. at 536–37, 108 S.Ct. at 1959 (citations omitted). This passage is not a great improvement in clarity over previous efforts, and it would not provide us with much to go on had the Court not chosen to reaffirm in a footnote the correctness of its decision in *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). *Berkovitz,* 486 U.S. at 538, n. 3, 108 S.Ct. at 1959, n. 3. A comparison of the facts of *Indian Towing* with those of the instant case makes it quite clear that the discretionary function exception does not apply. The Plaintiffs in *Indian Towing* sued to recover losses sustained when a barge ran aground due to the failure of Coast Guard personnel to keep a lighthouse in operation. The Court held that

> [t]he Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on [the site in question] ... it was obligated to use due care to make certain that the light was kept in good working order ... [i]f the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

350 U.S. at 69, 76 S.Ct. at 126–27. The Fifth Circuit has paraphrased the holding of *Indian Towing* as follows: "the decision to operate a lighthouse was discretionary, but once the decision was made there was no discretion to operate the light negligently." *Payton v. United States,* 679 F.2d 475, 479 (5th Cir.1982).

The parallels between the facts of *Indian Towing* and those of our case should be obvious. The Government had no obligation to ordain the practice of issuing postconviction press releases in tax evasion cases; but having done so, it was obligated to use due care in issuing them. The decision to make a practice of issuing press releases was discretionary in nature, grounded as it was in "social, economic, and political policy", *Berkovitz*, 486 U.S. at 537, 108 S.Ct. at 1959, quoting *Varig Airlines, supra,* 467 U.S. at 814, 104 S.Ct. at 2765. The policy here is the wish to deter tax evasion by making public the identities of those who run afoul of the tax evasion laws; the policy in *Indian Towing* was the wish to minimize the loss of life and property stemming from unplanned encounters between ship and shore. The decisions that led to the issuance of the press releases that let the world in on Johnson's troubles, however, were only the "nondiscretionary acts of execution" that accompany "discretionary decision-making", *Payton, supra,* 679 F.2d at 480. The actions complained of here clearly fall outside the § 2680(a) exception.

### (b) *Tax Exception*

■ 28 U.S.C. § 2680(c) exempts from the Federal Tort Claims Act any claim

arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods or merchandise by any officer of customs or excise or any other law-enforcement [sic] officer.

This Court cannot accept the Government's position that any misdeeds committed by the individual defendants in this case, whether of omission or commission, were sufficiently related to the assessment or collection of taxes to fall under § 2680(c). It is true, as the Government points out, that the Fifth Circuit has stated in *Capozzoli v. Tracey,* 663 F.2d 654, 658 (5th Cir.1981), that § 2680(c) "is broad enough to encompass any activities of an IRS agent even remotely related to his or her official duties"; but *Capozzoli* goes on to say, four paragraphs later, that it does not

intend to suggest that the government is insulated from tort liability for any and all transgressions committed by IRS employees. Section 2680(c) does not so state ... it is conceivable that an IRS agent could engage in tortious conduct sufficiently removed from the agent's official duties of assessing or collecting taxes as to be beyond the scope of Section 2680(c), and at the same time sufficiently within the scope of his employment as to give rise to an action against the United States.

Admittedly *Capozzoli* leaves but a narrow window of liability, but we believe it is precisely suits of this sort that fall within *Capozzoli's* narrow reading.[10]

Accepting, then, that not all work-related errors of IRS employees fall within § 2680(c), what it is that distinguishes those within from those without? The distinction we seek has been lucidly expressed by plaintiff in one of his pretrial pleadings

---

**10.** We have not overlooked the Fifth Circuit's decision in *Interfirst Bank Dallas, N.A. v. United States,* 769 F.2d 299, 307 (5th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986), in which it stated that § 2680(c) "specifically applies to *all* tax-related claims." (Emphasis in original.) Yet *Interfirst* did not explicitly overrule *Capozzoli,* and we may not speculate, even were it our right to do so, that the *Interfirst* court overlooked *Capozzoli,* since it mentions that decision, 769 F.2d at 308. Both opinions were, in fact, written by the same judge. They may be reconciled on the assumption that the kind of claim for which the *Capozzoli* court would have allowed FTCA liability—insufficiently related to official duties to fall within § 2680(c), but sufficiently within the

scope of employment to render the employer liable—would have been regarded by the *Interfirst* court as a claim that was not "tax-related".

Strained though this interpretation may seem, its acceptance averts the unpalatable recognition of a contradiction in the law. Those who prefer to face the contradiction are reminded of *Capozzoli's* remark that § 2680(c) "does not so state [that the government is insulated from liability for all torts of IRS employees]," 663 F.2d at 658, which implies that if Congress had intended a blanket exemption, it could have said so. We agree. Such a principal of construction points in the direction of accepting *Capozzoli's* restricted, but not nonexistent, liability over *Interfirst's* blanket exemption, if the two decisions are truly in conflict.

(instrument no. 74, p. 44): § 2680(c) embraces situations

directly involving audit, collection, or administration of a particular taxpayer's status [regarding] liability for tax. Our case, however, concerns the criminal process, not the collection or assessment of taxes.

We agree. If § 2680(c) does not cover all IRS activities whatsoever, then it should not cover activities that essentially pertained only to publicity: the actions complained of involved neither the determination that back taxes and penalties were due, nor the calculation of the amounts owing, nor the procedures by which those amounts were to be collected.

The Government contends that under *Kosak v. United States*, 465 U.S. 848, 854, 104 S.Ct. 1519, 1523, 79 L.Ed.2d 860 (1984), there can be no room for doubt that our case falls within the tax exception of § 2680(c). Kosak sued the United States to recover for damage to his property that occurred while it was in the custody of the Customs Service. He conceded that the property had been lawfully detained. The Court held that the suit was barred by § 2680(c), which also covers claims "arising in respect of . . . the detention of any goods or merchandise by any officer of customs . . .". The Court held that

"any claim arising in respect of" the detention of goods means any claim "arising out of" the detention of goods, and includes a claim resulting from negligent handling or storage of detained property.

465 U.S. at 854, 104 S.Ct. at 1523. It is true, of course, that the words "arising in respect of" also govern the words "the assessment or collection of any tax", and we do not lightly dismiss the argument that *Kosak* mandates the dismissal of any claim that is even tangentially related to a tax matter. We do not believe, however, that the words "arising out of", which *Kosak* takes as the definition of the statutory phrase "arising in respect of", necessitate such a conclusion. It is evident to this Court that there is a much closer link between the detention and damaging of Kosak's property than there is between Johnson's conviction and the issuance of the press releases. Property (in Kosak's case, an art collection) is damaged by improper handling, transport, or storage, and it cannot be detained without being handled, transported, or stored; hence the customs agents cannot do their duty without placing themselves in situations where negligence may result in property damage. It would be entirely possible, however, for IRS personnel to pursue and punish tax evaders without exposing themselves to the risks of issuing improper press releases, for the issuance of press releases is no necessary part or consequence of the business of snaring tax evaders. The IRS has chosen to adopt a policy of issuing press releases, and while it may have good reasons to do so, it cannot maintain the necessity of doing so. For this reason we do not feel that the holding that Kosak's claim "arose out of" the detention of property by the Customs Service forces us to conclude that Johnson's claim "arises out of" the "collection or assessment" of a tax.[11]

11. We find indirect support for our analysis of *Kosak* in the *Interfirst* decision discussed *supra*, n. 3. *Interfirst* cites *Kosak* four times—769 F.2d at 307 n. 13, at 307 (text), and twice on 308—but nowhere for the proposition that it bars any action related in any conceivable way to a tax matter. Since a portion of the *Interfirst* opinion is addressed directly to the interpretation of § 2680(c), the fact that it does not rest its holding on the "arising out of" analysis in *Kosak* suggests that the *Interfirst* court did not think that analysis dispositive of every case linked in any way whatsoever to a tax matter.

We also believe that our analysis is consistent with the Fifth Circuit's decision in *Solus Ocean Systems, Inc. v. United States Customs Service,* 777 F.2d 326 (5th Cir.1985). Solus brought suit after the Customs Service sold his goods without notice. The Circuit dismissed, citing *Kosak* for the proposition that § 2680(c) "included all injuries associated with the detention." 777 F.2d at 328. As the Circuit observed, the sale "was the result of the goods having remained with Customs for well over a year and was *merely a part of the natural progression of Customs' detention.* The sale took place while the goods were detained by Customs and was *an incident of that detention,* being for the authorized purpose of paying for the storage charges accrued during the detention." [Emphasis added.] While we cannot prove that the Circuit in *Solus* was groping toward the same understanding of *Kosak*

■ At this stage of the case we do not wish to go any further into details of individual conduct than is necessary to determine whether liability attaches to the United States. For that purpose, we will confine our assessment of liability to the two Defendants whose negligent behavior is most apparent: Sassen and Stone.

We deal in this case with actions that rendered useless an entirely proper plea bargain between a defendant charged under the laws of the United States and an assistant United States attorney. The plea bargain arrived at in Johnson's case was a most sensible attempt to reconcile conflicting interests, as indeed every plea bargain is: on the Government's side, the duty to prosecute what was arguably a violation of the tax laws; on Johnson's side, a commendable desire to shield his wife, coupled with an entirely understandable reluctance to sacrifice his career over a charge that stemmed, not from any duplicity on his part, but only from her unwise accounting procedures. Johnson, his attorney, Powers, and the judge cooperated in an arrangement that allowed the matter to be resolved with due deference to the legitimate wishes of both sides, and then the actions of the IRS wrecked the arrangement and cost Johnson his career.

This Court has searched the record for evidence of any standing procedure, any formalized scheme, that should have prevented the press releases from issuing, and has come up with only one item: the statement in Section E, subsection six, of the District Director's memorandum of October 15, 1980 (Defendant's Exhibit 10), which states that:

> [t]he DPAO will coordinate all CID releases with the Branch Chief, Criminal Investigation Division, and the prosecuting U.S. Attorney.

We know of no way to define the verb "coordinate" that would allow the Defendants to argue with a straight face that any of them coordinated the releases with Powers. Giving all due weight to the inescapable vagueness of words, it seems to this Court an abuse of language to suggest that a person has "coordinated" a matter with another when she has not contacted him or, at the very least, an associate who is working on the same case.

Special Agent Stone's statements that he cleared the release with Powers will not avail him, for the simple reason that the Court does not believe him. We have listened to the tape of the telephone conversation between White and Powers after the first release went out, and are satisfied with Powers' sincerity. Since the Government did not call Stone to testify in person, we had no opportunity to judge his demeanor. It strains the Court's credulity to believe that Powers would have concluded the plea bargain with Johnson, then turned around and told all to Stone. Questions of honesty aside, such an action by Powers would have exposed him to sanctions for professional misconduct, and might have hampered him in future cases. For Powers to act as Stone says he did would have been equally unethical and unintelligent; and on grounds of expediency alone we cannot believe that Powers contravened the plea bargain.

It is clear that the IRS had no procedure or regulation to prevent fiascoes of this sort, with the sole exception of the provision just quoted—and that, it seems, was virtually a dead letter. The October 15, 1980 memorandum required the public affairs officers to draft post-litigation news releases on the basis of information furnished by the special agent, but did not require her to check whether the information he gave her was in the court records or otherwise was public knowledge. The fact that the information came to her from the special agent could not be taken as sufficient evidence of its public nature, since the agent might have obtained it from his personal file or notes.

that we have reached here, we certainly find no conflict between our result and that of *Solus.* Goods detained by the Customs Service must be gotten rid of if not returned to their owners. We cannot imagine a world in which the Cus-toms Service does not dispose of some of the goods it has seized, but we can easily imagine a world in which the IRS does not issue press releases about tax evaders. In the second situation the element of necessity is absent.

On cross-examination Sassen was asked why she did not obtain a copy of the relevant instruments before issuing the press release. She replied that "time is of the essence." In deposition she stated that the procedures that would have been necessary "to prevent this type of thing would have made it impossible to release, you know, to do the deterrent publicity on a timely basis" (Sassen, 76:7). We cannot understand that. If issuing a postconviction press release does in fact help to deter prospective tax evaders—a premise of which we are skeptical—we fail to see why the deterrent effect of Johnson's press release would have been lessened one iota by waiting the one to three days necessary to get the documentation from Houston to Austin by mail. With the advent of the FAX machine—not in general use in 1981—even a demonstrable link between deterrence and an immediate press release could not justify the issuance of a press release if the Public Affairs Officer did not have the court papers before her.

The negligence of Stone and Sassen is clear. Section 6103 created a duty; they breached that duty by engaging in activities that led to the release of information not in the public record.[12] In so holding we do not exonerate the other individual Defendants; we simply suspend judgment for the present.

### CAUSATION

The Government maintains that Johnson has not shown that the press releases were the proximate cause of his downfall, and that the fact of his conviction alone would have been sufficient to force him out of his job. We do not agree.

The essence of the Government's position is that Johnson was obligated to inform the board of directors of his conviction, and that the board would have been obligated to discharge him. The Government has produced no authority to back up the first assertion. *Kirk v. State*, 611 S.W.2d 148 (Tex.Civ.App.—El Paso 1981, no writ), which the Government incorrectly cites as a decision of the Court of Criminal Appeals, and *Huett v. State*, 672 S.W.2d 533 (Tex.App.—Dallas 1984, pet. ref'd), address issues pertaining to the duty of a dealer in securities to disclose material facts to prospective investors, and say nothing about any duty of a corporate officer to inform the board of directors of his company about his conviction. The Government alternately contends that by his own admission Plaintiff eventually would have informed the board. In any event, it does not matter whether the board would have learned of the conviction, because the Government has not convinced us either that the board would have been obligated under Texas law to discharge him, or that it would have discharged him for the sake of propriety. Behind the Government's rather cryptic discussion of *Kirk* and *Huett* may lurk the idea that the board would have had to fire Johnson because his conviction was a material fact, the failure to disclose which would have placed the company, or some of its personnel, in violation of blue sky laws such as Tex.Rev.Ann.Civ.Stat. Art. 581–29 C(3) (Vernon Supp.1991), which makes it a felony to omit to state, in connection with the sale of securities, any "material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading ...". But under *Kirk* and *Huett*, information is material if a reasonable investor would consider it important in deciding whether to invest. *Kirk*, 611 S.W.2d at 151; *Huett*, 672 S.W.2d at 540. We cannot believe that a reasonable investor who knew all the circumstances behind Johnson's conviction would attach any importance to it; hence there can be no question of any duty of disclosure. We place no value on the Government's speculations that the board would have fired Johnson anyway; on the contrary, given his outstanding record with the company, the factual underpinning of his tax troubles, and especially the fact that some of his associates had known of his problems since the late 1970's and had made clear their con-

---

12. Plaintiff correctly states that, contrary to the Government's belief, we did not hold in our earlier opinion that all IRS news releases about convictions violate § 6103.

tinuing confidence in him, we think it most unlikely.[13]

The Government also refers us to Tex. Ins.Code Ann. Art. 21.07–3, § 12(f) (Vernon 1981), which states that the insurance commissioner may deny, suspend, or revoke the license of a managing general agent who has been convicted of a felony. The relevance of this provision escapes us. The Government has made no attempt to show that Johnson was a "managing general agent", and the definition of that term in § 2(a) of Art. 21.07–3 shows clearly that it applies to a person whose primary duty is to supervise the operations of an insurance company's agencies and field operations in Texas or a part of it. Johnson's responsibilities were of an altogether broader nature, and encompassed American National's operations on a national, and even an international, scale.

Finally, the Government argues that Johnson had a duty as a fiduciary to disclose his conviction to the board of directors. The case it cites in support of this position, however, say nothing of the sort. Both *Wiberg v. Gulf Coast Development Co.*, 360 S.W.2d 563, 567 (Tex.Civ.App.— Beaumont 1962, writ ref'd n.r.e.) and *In re Missionary Baptist Foundation of America, Inc.*, 48 B.R. 885, 889 (Bankr.N.D.Tex. 1985), *rev'd on other grounds*, 818 F.2d 1135 (5th Cir.1987), deal with situations in which a fiduciary had a personal interest in a transaction in which the company was engaged, and we do not see their relevance to the case at hand.

We now turn our attention to the Texas causes of action on which Plaintiff bases his FTCA claim.

### (a) *Respondeat Superior*

■ Among the many statements of the ancient doctrine of *respondeat superior* to be found in the decisions of the Texas courts, the following is one of the more recent:

To impose liability on an employer for the tort of his employee under the doctrine of *respondeat superior*, the employee's act must fall within the scope of the employee's general authority and must be in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired.

*Wilson v. H.E. Butt Grocery Co.*, 758 S.W.2d 904, 906 (Tex.App.—Corpus Christi 1988, no writ). To demonstrate in minute detail that the individual Defendants whom we have held to be negligent sufficiently met the requirements of this formulation to pass the liability for their negligence on to their employer, the United States, would be an exercise in pedantry. This Court has seen no evidence whatsoever that would suggest that any of the actions complained of fell outside the course and scope of employment. No one, needless to say, has questioned the existence of a master-servant relationship between the individual Defendants and the United States. The doctrine's applicability could not be more plain. We hold the United States vicariously liable for the negligence of Sassen and Stone; the determination of vicarious liability for the conduct of the other individual Defendants will await the next stage of this action.

### (b) *Negligent supervision of employees*

■ Texas law recognizes the tort of negligent hiring and supervision of employees. *Dieter v. Baker Service Tools*, 739 S.W.2d 405 (Tex.App.—Corpus Christi 1987, *writ denied*). In this case no allegations of negligence in hiring have been made. Negligent supervision appears to differ from *respondeat superior* chiefly in not requiring that the employee's misdeeds have occurred within the course and scope of his employment, although they must be at least remotely job related. *Dieter*, 739 S.W.2d at 408. The *Dieter* court observes that were course and scope required to find liability for negligent hiring and supervi-

---

**13.** The high esteem in which Johnson was held is also evidenced by the fact that after losing his job he was not booted out of the company, but was allowed to continue working at a lower level until his retirement. This circumstance strongly suggests that his firing was purely a cosmetic operation designed to protect the company's image; hence, it would not have taken place if the conviction had been kept hushed up.

sion, that tort "would be rendered superfluous by the *respondeat superior* doctrine." That being the case, a finding of negligent supervision appears to follow almost automatically from our finding of *respondeat superior* negligence. We hold that the United States was negligent in its supervision of Sassen and Stone; the question of negligence in the supervision of the other individual Defendants will not be decided now.

### (c) *Invasion of Privacy*

Texas law holds that "an unwarranted invasion of the right of privacy constitutes a legal injury for which a remedy will be granted." *Billings v. Atkinson,* 489 S.W.2d 858, 860 (Tex.1973). Following the analysis of Dean Prosser, the Texas Supreme Court has subdivided the tort of invasion of privacy into four distinct torts. *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682 (Tex.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977). Of these, Plaintiff pleads only two.

■ The first is the public disclosure of embarrassing facts about the Plaintiff. To recover Plaintiff must show

(1) that publicity was given to matters concerning his private life,

(2) the publication of which would be highly offensive to a reasonable person of ordinary sensibilities, and

(3) that the matter publicized is not of legitimate public concern.

*Industrial Foundation,* 540 S.W.2d at 682. We cannot find for the Plaintiff on this claim, because we cannot agree that the third requirement has been met. Skeptical though we are that the issuance of postconviction press releases helps to deter prospective tax evaders, we must stop short of affirming that it does not, and we cannot, therefore, hold that the identity of those who are convicted of violating the tax laws is not of legitimate public concern. The essence of the wrong done to Johnson is that the IRS negligently publicized information which was not in the public record, and which he had been assured would be kept secret. It does not follow that because the information in question was not on the public record, it could not be of legitimate public concern. We assume that every day plea bargains take place in which some consideration is given by the prosecutor to the defendant's desire to minimize publicity, but it does not follow that the subject matter of any such case could be of interest only to scandal-mongers. In the absence of case authority we are not prepared to undertake what the Texas courts might well view as an impermissible expansion of this variant of the Texas right of privacy.

■ Plaintiff also argues that his right of privacy was violated because the publicity he received placed him in a false light in the public eye, by implying that he had admitted to falsifying deductions and altering documents. *Industrial Foundation, supra,* 540 S.W.2d at 682. This claim is barred. Its essence is injury to Johnson's reputation, and it therefore falls under 28 U.S.C. § 2680(h), which exempts from the FTCA any claim arising from libel, slander, or misrepresentation. *Bosco v. U.S. Army Corps of Engineers, Fort Worth District,* 611 F.Supp. 449, 453 (N.D.Tex.1985).

### (d) *Breach of confidential relationship*

■ Plaintiff's contention that the actions complained of breached a confidential relationship appears to rest on a misunderstanding of that somewhat nebulous concept of Texas law. A confidential relationship exists where one party justifiably trusts and relies on—that is, places his confidence in—another; it has nothing to do with confidentiality in the sense of secrecy or privacy. (We do not, of course, deny that there may be circumstances in which the disclosure of confidential information constitutes a breach of a confidential relationship; the point is that we have just used the word "confidential" in two different ways.) Although

> a confidential relationship may be shown outside the usual case of a partnership, attorney-and-client, or family relationship, the evidence must show that dealings between the parties have continued

for such a period of time that one party is justified in relying on the other to act in his best interest.

■ *Thomson v. Norton,* 604 S.W.2d 473, 476 (Tex.Civ.App.—Dallas 1980, no writ). We have seen no case law to suggest that the concept embraces relations between a citizen and his government, and we leave such an extension to some enterprising jurist of the future.

### DAMAGES

Plaintiff seeks the following damages:

| | |
|---|---:|
| Loss of earnings | $ 3,675,917 |
| Loss of pension benefits | 1,524,492 |
| Loss of deferred compensation | 664,208 |
| Loss of sale of Galveston house | 37,500 |
| Loss of position and other employment benefits | 10,000,000 |
| Emotional distress and mental anguish | 10,000,000 |
| | $25,902,117 |

We cannot separate loss of position, by which Johnson seems to mean the aggregate of luxuries that are the familiar perquisites of members of the corporate elite—palatial office accommodations, company aircraft at his disposal, and other such privileges—from emotional distress and mental anguish, and we believe that five million dollars will cover all intangibles.

Plaintiff asks a great deal. He also has suffered a great deal. A flourishing career was shot down over a tax deficiency of less than three and one-half thousand dollars [14] which stemmed from no desire to cheat the Government, but only from the naive accounting procedures of a well-meaning wife. We need not recapitulate the evidence, from both Johnson and his wife, as to the depth of his despondency in the aftermath of the disaster, or the extent, so clearly visible in his demeanor upon the witness stand, to which he suffers still from the events of a decade ago. Furthermore, it is clear that the suffering Mrs. Johnson has so evidently undergone has added substantially to her husband's anguish. The events complained of not only wrecked a career; they also brought a great deal of pain into what had been, and we hope is once more, a happy marriage.

On direct examination Johnson gave the following testimony:

Q: Did you ever have occasion to meet the criminal investigator who was assigned to your case?

A: Yes sir, I did.

Q: Back in the late 1970s did you meet him?

A: Yes sir.

Q: Now, did he ever have occasion to give you a lecture about what the IRS was trying to accomplish in your case, sir?

A: Yes sir.

Q: Would you please repeat that to the Judge?

A: Early on after the agent came on the case, I was talking to him one day when he was visiting Galveston and I said to him, I believe his name was O'Connell, I said "Mr. O'Connell, if I have done something wrong, why don't you at least tell me or our attorneys what it is that I have done so that we can fix it and get on with—let me get on with what I am doing?" His reply to me was that the only favorable publicity that the Internal Revenue Service can get is when they bring a big one down and he said "your name is a household word to thousands of people" and I said "do you mean to tell me that you think you can take me to a court of law and get a conviction on me with what you have from my records?" He said, "probably not, but I can get your name in the newspapers and that will have accomplished my purpose."

If the IRS continues to allow mishaps of the type that blighted Johnson's life to occur, we shall be forced to conclude that this agent's attitude is typical of the spirit in which the IRS publicizes information about tax evaders.

We find for the Plaintiff, and grant judgment against the United States of America in the amount of ten million, nine hundred and two thousand, one hundred and seventeen dollars.

---

**14.** Calendar year 1975. Criminal information, n. 3, *supra.*

Costs are assessed against the United States.

Counsel for Plaintiff shall prepare a judgment in accordance with this opinion and submit it to counsel for the United States for approval as to form. The judgment shall be submitted to the Court within thirty (30) days of the date of this opinion.