IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2763
_____

ELVIS E. JOHNSON

Plaintiff-Appellee

versus

ROBERT SAWYER, ET AL.,

Defendants,

UNITED STATES OF AMERICA

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

Before JOHNSON, GARWOOD, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this suit for damages under the Federal Torts Claims Act (FTCA or the Act),[1] the United States as Defendant-Appellant appeals the decision of the district court in favor of the Plaintiff-Appellee Elvis E. Johnson. His FTCA action arises from the public dissemination of private taxpayer information about Johnson by agents of the IRS. Finding no reversible error on the issue of liability, we affirm that part of the judgment of the district court as well as special damages albeit with a modification of the pension loss element. But in the absence of any explanation by the district court of how it calculated damages

_____

[1]28 U.S.C. §§ 1291, 1346, 2671-2680 (1988)(FTCA or the Act).

for emotional distress and mental anguish, we reverse and remand for further explanation or re-calculation of the quantum of damages awarded for that aspect of Johnson's injuries.

I

FACTS AND PROCEEDINGS

The facts of this case are reported in considerable detail in the published opinions of the district court.[2] We therefore set out in this opinion only those facts required to give necessary perspective of the issues of significance presented by the instant appeal.

Elvis Johnson began selling insurance for a branch of the American National Life Insurance Company (American National) in the early 1950s. Johnson was a proficient salesman who advanced up the company ladder, eventually becoming one of its sales leaders. In 1972, Johnson moved from Missouri, where he was head of a sales region, to American National's headquarters in Galveston, Texas.

After the move to Galveston, Johnson continued to advance. Eventually, he became the Senior Executive Vice President, the Chief Marketing Officer, and a member of the Board of Directors. At the time of his forced resignation, he was in line to become the company's next Chief Executive Officer.

In the late 1970s, the Internal Revenue Service (IRS) began looking into Mr. and Mrs. Johnson's tax returns. Discrepancies

---

[2]Johnson v. Sawyer, 760 F. Supp. 1216 (S.D. Tex. 1991); Johnson v. Sawyer, 640 F. Supp. 1126 (S.D. Tex. 1986).

were discovered in the Johnsons' records. The discrepancies were due, in large part, to the erroneous (or as the district court characterized them, "eccentric") bookkeeping practices of Mrs. Johnson, to whom Johnson had delegated his personal expense record keeping, in large measure to familiarize his wife with family business matters in case of his unexpected demise.[3] An IRS examining agent referred the case to the IRS Criminal Investigation Division, which eventually assigned the case to Special Agent Stone. After the criminal investigation was completed, the United States Department of Justice recommended that Johnson and his wife to be prosecuted for tax evasion.[4]

During the course of the investigation, Mrs. Johnson had disclosed her part in the matter by submitting to a deposition at the office of the assistant U.S. Attorney assigned to the case, James Powers. Johnson did not want the IRS to upset his wife further regarding their taxes and was adamant that she not be indicted. Eager to work out an arrangement that would ensure his wife's noninvolvement, Johnson agreed to Powers's plea bargain offer: In exchange for Johnson's plea of guilty to one count of tax evasion, the government would recommend probation for him and would not indict or further trouble Mrs. Johnson. As a part of the plea agreement the government also accepted inclusion of several measures designed to keep the prosecution from becoming known to

_____

[3]The nuances of Mrs. Johnson's accounting procedures are set out in the second opinion of the district court. See 760 F. Supp. at 1218-21.

[4]See 26 U.S.C. § 7201 (1988).

3

the general public.  The agreement provided that:

> (1)  all papers filed in the case would give plaintiff's name as "Elvis Johnson" rather than "E.E. 'Johnny' Johnson," by which he is normally known;

> (2)  papers requiring Johnson's street address would give it as 1100 Milam Street in Houston, which was the address of his attorney, and no reference to his address at 25 Adler Circle, Galveston would be made;

> (3)  the Government would seek to have the presentence investigation completed before the criminal information was filed so that the probation officer's recommendation could be made known to the judge by the time the information was filed;

> (4)  the information would be filed late on a Friday afternoon, and the case would be brought before the judge immediately, so that arraignment and sentencing could be completed that same afternoon; and

> (5)  the U.S. Attorney's office would publish no press release.

> Powers also agreed to recommend probation, and not to oppose a plea of nolo contendere.[5]

Faithful to that arrangement, the government filed a Criminal Information charging Johnson with but a single count of tax evasion on his 1975 return.[6]  To minimize the chance of accidental publicity, the filing was timed for late on the afternoon of Friday, April 10, 1981.  Although the court refused to accept a nolo plea, it was satisfied to assess a probated sentence on Johnson's plea of guilty.  In a courtroom devoid of spectators, Johnson entered his guilty plea and received a probated sentence; no fine was imposed.

In the instant FTCA case, the district court found, among

---

[5]760 F. Supp. at 1221.

[6]*Id*. n.3.

4

other facts regarding the plea arrangement, that Johnson had kept his closest business associates and superiors apprised of his problems with the IRS; and that his position with the company was secure, regardless of the guilty plea, as long as there was no public scandal regarding Johnson's tax problems. American National was a publicly held corporation, and Johnson's superiors did not want it known outside the company that the second most senior officer of the corporation had pleaded guilty to a criminal tax charge.

Despite the extraordinary measures that both the United States Attorney and Johnson's counsel had taken, however, public knowledge followed quickly on the heals of Johnson's plea. Without advising or consulting Powers or anyone else at the Department of Justice, the IRS issued a news release on Wednesday, April 15, 1981--the third business day after Johnson's plea--that went well beyond the provisions of the plea agreement and, more significantly, disclosed vital information that was not contained in the records of the court in which Johnson had pleaded guilty.[7]

---

[7]The IRS news release stated:
INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE
    GALVESTON, TEXAS--In U.S. District Court here, Apr. 10, Elvis E. Johnson, 59, plead [sic] guilty to a charge of federal tax evasion. Judge Hugh Gibson sentenced Johnson, of 25 Adler Circle, to a six-month suspended prison term and one year supervised probation.
    Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns.
    In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and

5

When Johnson learned of the release, he immediately contacted his attorney, who just as immediately called Powers. Johnson's lawyer was told by Powers that he was not responsible for the release and that Johnson's lawyer should speak to someone with the IRS. Counsel then called the IRS and informed officials there that the release contained information that was not supposed to be disclosed as well as erroneous information. Compounding the damage, and over the strenuous objections of Johnson's counsel, the IRS issued a second release on April 17, 1981,[8] which corrected an error regarding the  exact charge to which Johnson had pleaded guilty and restated the specific facts about Johnson and his tax problems.

Once the information about Johnson's guilty plea in the tax evasion case became so widely and publicly known, the effects on his career were tragic and swift. He was "asked" to resign from his positions at American National; the CEO and other senior officials with the company had been willing to allow Johnson to keep his position and his career track, but only as long as his tax problem was kept within the company and not made known to the

---

interest.
Id. at 1222.

[8]The heading and the first and third paragraphs of the second press release were the same as the first.  The second paragraph read:
> Johnson, an executive vice-president for the American National Insurance Corporation, was charged in a criminal information with willful evasion of federal tax by filing a false and fraudulent tax return for 1975.

Id. at 1222.

public at large.  Johnson and his wife left Galveston and returned to the Missouri branch office where he had begun his career with American National.  There Johnson worked as a salesman for American National until he was forced to retire at the age of sixty-five, the mandatory retirement age for all company employees other than the few topmost executives, who were permitted to serve actively until age 70.

Johnson sued several of the IRS officials involved in the press release, claiming that the release of disclosed tax information violated 26 U.S.C. § 6103.  Johnson subsequently amended his complaint to include an FTCA claim against the United States.  The FTCA claim was severed from those against the individual defendants and tried to the court without a jury.  At the conclusion of the bench trial, the court granted Johnson a judgment against the United States in the amount of $10,902,117. The United States timely appealed that judgment.

## II

## ANALYSIS

### A.  Johnson's Claim Under the FTCA

The FTCA constitutes a general waiver of the federal government's sovereign immunity from tort claims.[9]  Under the Act, suits against the United States are authorized

> for injury or loss of property, or personal injury or death caused by negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be

---

[9]See 28 U.S.C. § 2674 (1988).

liable to the claimant in accordance with the law of the place where the act or omission occurred.[10]

The Act also provides that the United States will be liable in tort "in the same manner and to the same extent as a private individual under like circumstances."[11]

To recover under the FTCA, Johnson must be able to succeed against the government in a <u>state</u> law tort cause of action. Johnson's theory of state law negligence is: (1) in Texas, violation of a statute is negligence per se when a member of the class of persons protected by the statute is injured by the violation; (2) the government owed him a duty, under 26 U.S.C. § 6103, not to release any of his confidential tax information; (3) through its agents, the government breached its duty to Johnson under § 6103 by issuing protected information in the press release; and (4) the breach of the duty established by § 6103 caused Johnson's injury.

The government counters that the breach of a federal statute, here § 6103, cannot establish liability under the FTCA. As far as it goes that statement is irrefutable, but it stops short of addressing the full import of Johnson's position. Johnson does not contend simplistically that the violation of § 6103 ipso facto creates FTCA liability. Rather, he asserts that § 6103 sets a standard of behavior and that, under Texas tort law, the violation

---

[10]28 U.S.C. § 1346(b); <u>see</u> <u>United States v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. 797, 807-08 (1984).

[11]28 U.S.C. § 2674.

8

of such a statutory standard is negligence per se when one who is afforded protection by the standard is damaged by its violation.

The first question this court must answer, then, is whether Johnson's premise that Texas recognizes a tort in this situation is correct. The answer is a resounding "yes." The Texas Supreme Court has held repeatedly that "[t]he unexcused violation of a statute setting an applicable standard of care constitutes negligence as a matter of law if the statute is designed to prevent an injury to the class of persons to which the injured party belongs."[12] Johnson was clearly a member of the class that the statute was written to protect,[13] and none of the recognized excuses for violation of a protective statute apply in this case.[14]

---

[12]El Chico v. Poole, 732 S.W.2d 306, 312 (Tex. 1987)(citing Nixon v. Mr. M Property Management Co., 690 S.W.2d 546, 549 (Tex. 1985), and Murray v. O & A Express, Inc., 630 S.W.2d 633, 636 & n.4 (Tex. 1982)); see Moughon v. Wolf, 576 S.W.2d 603, 604 (Tex. 1978); Missouri P. R.R. v. American Statesman, 552 S.W.2d 99, 103 (Tex. 1977).

[13]In 1976, § 6103 was amended as part of a sweeping reform of the tax code. The goal of this amendment to the code was two-fold. Congress wanted to stem the tide of information, which was voluntarily disclosed to the IRS, from being disclosed to other persons or agencies because of privacy needs of those who discloser information (i.e., all taxpayers). Congress also reasoned that the possible abuses of privacy of the system could "seriously impair the effectiveness of our country's very successful voluntary assessment system which is the mainstay of the Federal tax system." S. Rep. No. 938, 94th Cong., 2d Sess., pt. 1, at 317 (1976), reprinted in 1976 U.S.C.C.A.N. 3439, 3747. See generally Mertens Law of Federal Income Taxation: Tax Reform Act of 1976 Analysis 117-25 (James J. Doheny ed., 1977).

[14]In Impson v. Structural Metal, Inc., 487 S.W.2d 694, 696 (Tex. 1972), the Texas Supreme Court approved the Restatement (Second) of Torts § 288A as substantially stating Texas law concerning civil liability for violation of a penal statute. Section 288A provides five categories of situations where a statutory violation is excused. They are:

Unquestionably, § 6103 creates a duty and in so doing sets an applicable standard of care. It imposes on the government a general duty of confidentiality as to information disclosed made by taxpayers. Section 6103 broadly prohibits public disclosure of such information. That prohibition is subject to but a handful of narrow exceptions. Section 6103 provides:

> (a) General rule.
> Returns and return information shall be confidential, and except as authorized by this title--
> (1) no officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or employee or otherwise or under the provisions of this section.

"Return information" is defined as "a taxpayer's identity, the nature, source, or amount of his income, . . . deficiencies, . . . whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing."[15] And "taxpayer identity" is defined as the name, mailing address, taxpayer identifying number, or any combination thereof.[16]

Considering this general information, we must answer three

---

> (a) the violation is reasonable because of the actor's incapacity;
> (b) the actor neither knows nor should know of the occasion for compliance;
> (c) the actor is unable after reasonable diligence or care to comply;
> (d) the actor is confronted by an emergency not due to his own misconduct;
> (e) compliance would involve a greater risk of harm to the actor or to others.

Id.; see O & A Express, 630 S.W.2d at 636 n.4.

[15] 26 U.S.C. § 6103 (b)(2)(A).

[16] Id. § 6103 (b)(6).

10

specific questions to determine whether Johnson's theory can stand on appeal:  (1) Did the agents' conduct violate § 6103?; (2) if so, did that violation amount to negligence under Texas tort law?; and (3) if so, did that negligence proximately cause the Johnsons' injuries?  We find positive responses for all of these questions.

1. § 6103 Violation

The threshold question here is whether a violation of § 6103 occurred at all.  Johnson asserts that by releasing the protected information about him, the IRS agents clearly violated § 6103.  Some of the information released about Johnson had been discussed in his tax evasion proceeding, but other information about him was neither discussed in that proceeding nor otherwise appeared in the record of the court.  Although provisions of § 6103 exempt certain disclosures,[17] no provision specifically exempts disclosures such as those made in the instant case.

The government urges this court to adopt the rule of the Ninth Circuit that once information is disclosed in open court or is in some other manner stripped of the confidentiality requirement of § 6103, the IRS may release that information with impunity.[18]  In Lampert v. United States, the Ninth Circuit stated that "Congress sought to prohibit only the disclosure of confidential tax return information" and held that "[o]nce tax return information is made a part of the public domain, the taxpayer may no longer claim a

---

[17]See, e.g., id. § 6103 (h)(4).

[18]See William E. Schrambling Accountancy Corp. v. United States, 937 F.2d 1485, 1488-89 (9th Cir. 1991), cert. denied, 112 S. Ct. 956 (1992).

11

right of privacy in that information."[19]  Thus, that circuit holds that once information is disclosed in a criminal proceeding against a taxpayer, the IRS may release that information to the press without violating § 6103.

Johnson counters by urging us not to accept the Ninth Circuit's rule but instead to adopt the view of either the Tenth or the Seventh Circuits on this issue.  The Tenth Circuit holds that information protected by § 6103 never loses its confidentiality, even when it is disclosed in a court record.[20]  The Seventh Circuit holds that the "immediate source" of the information, at least in a cases of information being taken from a court opinion or record, might control confidentiality.  Specifically, the Seventh Circuit has held that when the facts disclosed are gleaned from court records, no § 6103 violation occurs.[21]  The Seventh Circuit did not speculate, however, as to what the outcome might be in a case in which the "immediate source" of the information is the confidential records of the taxpayer but the information can also be found in a court record.  Neither did that court speculate as to the possible outcome of a case in which the "immediate source" of the information is the tax records and the information is not to be

---

[19]854 F.2d 335, 338 (9th Cir. 1988), cert. denied, 490 U.S. 1034 (1989).

[20]See Rogers v. Hyatt, 697 F.2d 899, 906 (10th Cir. 1983); see also Chandler v. United States, 887 F.2d 1397, 1397-98 (10th Cir. 1991)(following Rogers v. Hyatt).

[21]Thomas v. United States, 890 F.2d 18, 20-21 (7th Cir. 1989).

12

found in a court record.[22]

The circumstances of the instant case are such that we are not required to adopt a rule from among those of the several circuits as the one henceforth to be applied in this circuit. Such a choice is unnecessary here because we are faced with a fact pattern unlike any yet ruled on in one of those other circuits. Here, the "immediate source" of the information was the taxpayer's confidential records and the information was not contained in a court record. Thus, it never lost its entitlement to confidentiality. Although we make no rule selection, we nevertheless observe that even if we were to follow the Ninth Circuit's rule as typified in its Lampert decision (which we do not), the disclosures made by the IRS agents in the instant case would still constitute a violation of § 6103.

Both of the press releases about Johnson contained more information than was contained in the official record of his plea and sentencing hearing. True, several items contained in the press releases (Johnson's first and last name, the guilty plea to one count of tax evasion, the sentence imposed, and the fact that he was an executive with American National) were part of the trial record. But several other items contained in those releases (Johnson's middle initial (he was known as "E.E." to many people), his age, his home address, and his official job title with American

_____

[22]See id.

13

National[23]) were not discussed at his arraignment or sentencing or placed in any public record. The government concedes that additional information about Johnson had been taken from his confidential taxpayer file or from the IRS investigation of Johnson, and inserted in the press release.

The Lampert court held that the fact that the information was contained in a public record, in effect, prevented its release from constituting a violation of § 6103. In the instant case, by contrast, significant portions of the released information were not contained in any public record, so even under Lampert no convincing argument can be made that the entire release was shielded and did not violate § 6103.

2. Violation of § 6103 as a Texas Tort

We find inescapable the conclusion that the IRS agents' violations of the standard of behavior and thus the duty established in § 6103 amounted to negligence under Texas tort law-- if not either reckless disregard or deliberate violation of that standard. Even under the relaxed Lampert rule, which again we do not adopt, the IRS agents' activities actionably violated § 6103's standard. After Johnson pleaded guilty, special agent Stone called Powers to ascertain the results of the conviction and plea arrangement. Immediately following that discussion, in which Powers informed Stone of all terms of the plea arrangement, Stone

_____

[23]The only reference during the proceeding about Johnson's job was the court's remark that "arrangements can be made to relax [the terms of Johnson's parole] to the extent that they will not interfere with the performance of [Johnson's] position as an executive for the American National Insurance Company."

14

nevertheless took it upon himself to contact Public Affairs Officer Sally Sassen, report Johnson's conviction on his plea and, without mentioning the proscription of publicity, have a news release prepared. Sassen took the information from Stone, wrote up the release, and had it disseminated for publication without ever checking its accuracy or the propriety of the sources of its information. The release was then approved for publication by Stone, who knew better, and by Michael Orth, the Branch Chief for Criminal Investigation, who also knew better or at least should have.

Although Stone did not testify in the FTCA case, he stated in a deposition that Powers had approved the publication of the release. But the district court made an explicit finding that Stone lied about obtaining Power's approval.[24] In fact, Powers had told Johnson's attorney in a taped telephone conversation credited by the court that if the news release damaged Johnson, he "should sue the hell out of them."[25]

There is no evidence in the record that any of the IRS personnel involved in creating or authorizing the press release checked to see whether the information contained in it appeared in the record of the tax evasion proceedings. Even if an agent tries to comply only with the relaxed standard of Lampert, he or she must, at a minimum, verify that the information in the release has been disclosed in the court proceedings or in some other public

---

[24]760 F. Supp. at 1229-30.

[25]Id. at 1222.

record.

At trial, Johnson testified, and the court accepted, that during an early meeting between Johnson and an Agent O'Connell, one of the investigators initially assigned to the case, O'Connell candidly told Johnson that

> the only favorable publicity that the Internal Revenue Service can get is when they bring a big one down and he said "your name is a household word to thousands of people" and I [Johnson] said "do you mean to tell me that you think you can take me to a court of law and get a conviction on me with what you have from my records?" He [O'Connell] said, "<u>probably not, but I can get your name in the newspapers and that will have accomplished my purpose</u>."[26]

This "trophy hunting" mentality is apparent in the actions of special agent Stone in his procuring of the news release through agent Sassen. Although both of them must have been aware of § 6103's stern strictures on disclosure of taxpayer information, they consciously effected the release of information coming directly from Johnson's taxpayer record without attempting to determine whether such information was or was not a part of the public record.[27] The protected information was deliberately publicized despite the obviously extreme and comprehensive efforts of the prosecution to keep such details out of the public record during the judicial proceedings, and thereby out of public view.

---

[26]<u>Id</u>. at 1233(emphasis added).

[27]Again, we restate that we do not decide whether the presence of information in a public record would shield the release of the information from being a § 6103 violation. We only decide that the wanton disregard of the standard set by § 6103 regarding Johnson's right to privacy vis-à-vis his taxpayer information was at least negligent behavior by Stone and Sassen.

The acts and omissions of the IRS agents directly and proximately caused the statutorily protected information twice to be released to the public at large--the second time _after_ Johnson's lawyer vigorously alerted the IRS to the problem. Irrespective of what inevitably might have come out in company and shareholder literature, or even publicly, concerning Johnson's case, the pair of widely disseminated news releases were the first public disclosures of his conviction--publicity that immediately decimated Johnson's exemplary business career.

### 3.  The Texas Tort and the FTCA

We do not believe that allowing a federal law, such as § 6103, to be used a standard of care is ~~not~~ contrary to the jurisprudence of this circuit.  For example, in _Moorhead v. Mitsubishi Aircraft International, Inc._,[28] the federal procedures found in the _FAA Flight Service Handbook_ were found to set the applicable standard of care under Texas tort law.  Also, in _Gibson v. Worley Mills, Inc._,[29] we provided, in an alternative holding, that under Texas law, the sale of a certain seed mixture was negligence per se because the sale was forbidden by 7 U.S.C. §§ 1561, 1571 (1976).[30]

---

[28]828 F.2d 278, 282 (5th Cir. 1987).

[29]614 F.2d 464 (5th Cir. 1980).

[30]_Id_. at 466; _see, e.g._, _In re Aircrash at Dallas/Fort Worth Airport_, 720 F. Supp. 1258, 1288 (N.D. Tex. 1989)(relying on federal regulations--specifically the _Federal Air Traffic Control Manual_ and FAA Order 7110.65D--for the standard of care under Texas tort law), _aff'd_, 919 F.2d 1079 (5th Cir. 1991), _cert. denied_, 112 S. Ct. 276 (1992).

Neither are we convinced that this holding is affected by United States v. Smith[31] or Tindall v. United States.[32]  In Tindall, we construed Mississippi tort law and found that the government had no duty to warn anticipated users of the potential dangers of certain devices.[33]  In footnote eight of that opinion, we rejected the proposition that a federal statute alone could establish a duty to the plaintiff.  In the instant case, we remain consistent with Tindall as we do not find that § 6103 itself creates an actionable duty.  We do find, though, that Texas tort law recognizes per se negligence when a statute or ordinance meant to protect a class of persons is violated--regardless of whether that statute or ordinance originates with federal, state, county, or city action.  Similarly, we are satisfied that the result we reach today is not inconsistent with our decision in Smith, which construed Georgia tort law.[34]

As we noted above, the government can only be held liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances."[35]  We find that there are state law torts analogous to the liability imposed on the

---

[31]324 F.2d 622 (5th Cir. 1963).

[32]901 F.2d 53 (5th Cir. 1990).

[33]Id. at 56.

[34]See Smith, 324 F.2d at 624-25.

[35]28 U.S.C. § 1346(b).

18

government in the instant case.[36]  In addition to such analogies, we find that it is possible for a private actor to be held civilly liable under Texas tort law for a violation of § 6103.

To grasp the full import of this point, it is necessary to focus on the operational or functional structure of § 6103, which is entitled "Confidentiality and disclosure of returns and return information."  Subsection (a) states the general rule that returns and return information shall be confidential, then specifies three broad categories of persons who ar prohibited from disclosing such confidential information.  First, subsection (1) of § 6103(a) prohibits _federal_ officers and employees from making such disclosures   Second, subsection (2) of § 6103(a) prohibits disclosure by _state_ officers and employees as well as by those of certain _local_ agencies, who have or had access to returns or return information under § 6103.  Third, to complete the picture,

_____

[36]Texas, as does most other states, recognizes the traditional torts of liable, slander, defamation, and malpractice.  Liability is imposed on private actors when one who is entrusted with such information (e.g., lawyers, psychiatrists, "insider" investment bankers, and under some circumstances, even reporters and editors) is under a statutory or regulatory mandate to maintain such confidences and yet he or she discloses that confidence.  As the dissent rightly points out, § 2680(h) retains governmental immunity for liable and slander.  We do not, however, rewrite the statute by pointing to analogous situations in state law in which private actors can be held liable for wrongful disclosure of confidential information.

In another analogous situation, only the federal government can be held liable regarding air traffic controllers--liability that arises under the FTCA--and their actions are regulated almost exclusively by federal rules and statutes.  But, as the attorneys in the Aviation department of the Department of Justice's Torts Branch will attest, an FTCA action certainly lies for an alleged state law tort action when a federal air traffic controller is accused of negligence.

subsection (3) of § 6103(a) prohibits disclosure by any person--no mention whatsoever of governmental employment or affiliation at any level--who has access to returns or return information under the aegis of various other subsections of § 6103.

Among the subsections listed in the catch-all provision of § 6103(a)(3) is subsection (n). That the reference to subsection (n) in § 6103(a)(3) implicitly if not explicitly covers persons of the private sector is confirmed in its recognition that, in the course of the government's obtaining services from the private sector, "returns and return information may be disclosed to any person . . . to the extent necessary in connection with the processing, storage, transmission, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for the purpose of tax administration."[37] Obviously, then, § 6103(n) contemplates the likelihood, nay, certainty, that such confidential information will of necessity be disclosed to employees of private sector independent contractors providing goods and services to the Treasury Department and the IRS, and that the express prohibitory language of § 6103(a)(3) is needed to extend its proscription to such private sector employees.[38]

Thus, for example, if in Texas a non-governmental computer programmer or computer maintenance worker were to be furnished or should otherwise encounter the kind of confidential return

_____

[37]28 U.S.C. § 6103(n).

[38]Cf. Wiemerslage v. United States, 838 F.2d 899, 902 (7th Cir. 1988)(illustrating that non-governmental employees are sometimes given access to confidential tax return information).

information the disclosure of which is prohibited by § 6103(a), his or her wrongful disclosure in violation of the prohibition clearly could subject such a worker to Texas tort liability analogous to subjecting the government to liability in the instant case.[39]

### 4. Causation

Causation is the final element of Johnson's tort theory that we must investigate. The government insists that the district court erred in finding that publication of the news releases was the proximate cause of Johnson's damages. We disagree.

On uncontradicted evidence, the trial court found that Mr. Clay (the president and CEO of the company) and several other members of the Board of Directors (but not a majority of the Board), had been told by Johnson about his tax troubles and his impending guilty plea. Nevertheless, on the Monday following the Friday on which Johnson's guilty plea was entered, he was told by Clay that in his (Clay's) opinion it would be best if Johnson would remain with American National. But, after the press releases appeared, all of that changed. Clay obviously felt compelled to bring the question of Johnson's continued employment before the full Board of Directors, which in turn requested Johnson's

---

[39]Our research reveals only four cases in which § 6103(n) was mentioned, none of which are relevant to the instant case. See Wiemerslage, 838 F.2d at 902; Ungaro v. Desert Palace, Inc., 732 F. Supp. 1522 (D. Nev. 1989); Crismar Corp. v. United States, 1989 WL 98843 (E.D. La.); Crown Cork & Seal Co. v. Pennsylvania Human Relations Comm'n, 463 F. Supp. 120 (E.D. Penn. 1979). We believe it is clear, however, that a "private individual under like circumstances" could be held liable under Texas tort law for a violation of the protections afforded to taxpayers by § 6103.

21

resignation.  The district court found that this, along with other evidence, demonstrated conclusively that the news releases were the proximate cause of Johnson's forced resignation and all job-related and personal losses that followed.

Findings of proximate cause by a district court, like other findings of fact, are reviewed by this court under the clearly erroneous standard.[40]  The district court examined Johnson's record as an American National employee and executive, the nature of his and his wife's tax troubles, the fact that several of the board members had already known about his guilty plea but had not called for his resignation, and the additional fact that Johnson was not asked to resign, even after he pleaded guilty, until the board felt forced to request his resignation following publication of the press releases.[41]  Reviewing all of the circumstances leading to Johnson's forced resignation, the district court found that the IRS's releases were the proximate cause of that and all of the disastrous consequences that flowed from it.  After our own careful review of the record and of the district court's findings and

---

[40]In re Air Crash at Dallas/Fort Worth Airport, 919 F.2d 1079, 1085 (5th Cir.)(citing Pullman-Standard v. Swint, 456 U.S. 273 (1982), and 53 Tex. Jur. 3d, Negligence § 129), cert. denied, 112 S. Ct. 276 (1991).

[41]We are not in a position to speculate what information would have been omitted from the press release to cause a different result (what information was critical to damage Johnson).  It is at least conceivable that if a press release had been issued containing only the information agreed to with Powers or only the information that appeared in the court record, the same result might have occurred.  Surely, however, it was not beyond reason for the jury to find that the confidential information that was released caused the damage to Johnson.

reasoning, we are not prepared to say that the court's finding of proximate cause is clearly erroneous.

## B. The Government's Affirmative Defenses

### 1. Action Sounds in Contract, not Tort

The government's first argument for reversal is that the trial court improperly allowed Johnson to proceed under the FTCA because the nature of the actions that damaged Johnson was the breach of the agreement made between Johnson and Powell. The government argues that "the District Court improperly based its decision on the grounds [sic] that the IRS's issuance of the press release was in violation of the plea agreement." The government mischaracterizes both Johnson's cause of action and the basis for the district court's judgment. Neither relied on breach of the plea agreement.

As discussed above, Johnson's assertions do, as he insists, fit a recognized theory of tort under Texas case law. Additionally, the government's breach of contract argument rings particularly hollow when viewed in the realization that the IRS was not even a party to the plea agreement between the Department of Justice and Johnson, and thus had no privity with Johnson.[42] Without privity there can be no breach of contract. Moreover, Johnson never asserted that the government was liable to him because the IRS violated his agreement with the Department of

---

[42]The plea agreement specified only that the Justice Department would not issue a press release.

23

Justice.  To the contrary, Johnson has consistently asserted that the government's liability results from violation of its duty toward him as established by § 6103.

We perceive the government's entire breach of contract argument to be a red herring.  Irrespective of its label, a plea agreement in a criminal case is not a contract in the civil sense.  A breach of a plea agreement may affect such criminal matters as sentencing, withdrawal of a plea, sentencing appeals, and the like; but the breach of a plea agreement never generates civil remedies such as monetary damages or specific performance.  Thus, we reject the government's breach of contract argument out of hand.  In so doing, however, we observe in passing that a plea agreement does create a duty owed by the government to the defendant, and thus a standard of care, the breach of which might constitute a tort under the right circumstances.

2.  Preemption

The government next asserts that the remedial structure of § 7217[43] of the Internal Revenue Code preempts the FTCA for resolution of claims such as Johnson's.  The government cites no direct authority for this proposition but relies on our holding, in Rollins v. Marsh,[44] that the FTCA was preempted by the Civil Service

---

[43]26 U.S.C. § 7217, which was in effect at the time this action arose, was replaced by § 7431.

[44]937 F.2d 134, 139-40 (5th Cir. 1991).

Reform Act of 1978 (CSRA).[45]  The government's reliance on Rollins is misplaced.  There, we acknowledged that, to preempt the FTCA, new legislation must specify comprehensive remedies that unmistakably provide the exclusive method for resolving controversies of the type covered by the legislation.[46]  In so acknowledging, we agreed with the conclusions reached earlier by the Eighth and Ninth Circuits that the remedial provisions of the CSRA were sufficiently comprehensive and exclusive to preempt the FTCA.[47]

We are convinced, however, that even though § 7217 may be comprehensive, it is not similarly exclusive.  Unlike the CSRA, which creates a cohesive system for the redress of civil servants' employment problems, § 7217 merely provides remedies for violations of § 6103; nowhere does Congress purport to make § 7217 preemptive of the FTCA.  The government fails to cite to this court any evidence that Congress intended for § 7217 to be the exclusive remedy for each and every § 6103 violation.[48]  We hold that

---

[45]Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended at 5 U.S.C. § 1101 et seq. (1988)).

[46]Rollins, 937 F.2d at 139.

[47]Id.; see Rivera v. United States, 924 F.2d 948, 951-52 (9th Cir. 1991); Premachadra v. United States, 739 F.2d 392, 393-94 (8th Cir. 1984).

[48]It is true that § 7217 is comprehensive in terms of allowing actions for breaches of § 6103.  This court, however, must recognize the significant distinction between "comprehensive" and "preemptive."  Rollins and other authorities instruct us that we must have some evidence of congressional intent before we hold that an enactment preempts the FTCA.  In this case, no such evidence of intent has been cited to this court, and our independent research reveals none.  We are thus

25

Johnson's right to sue the government under the FTCA for a tort arising from violation of the duty created under § 6103 is not preempted by § 7217.

3. <u>Discretionary Function Exception</u>

The government next argues that Johnson's claims are barred by the so-called discretionary function exception to the FTCA. By statute, that exception excludes from the FTCA's broad waiver of sovereign immunity "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."[49]

Clearly, however, the discretionary function exception does not encompass every act of a government employee that involves some element of discretion. This court has previously noted that our "decisions . . . have been extraordinarily careful to avoid any interpretation of the discretionary function exception that would embrace any governmental act merely because some decision-making power was exercised by the official whose act was questioned."[50] Thus, as virtually every act of a government employee involves at least a modicum of choice, we must exercise restraint when applying

---

unprepared to say that a statute that allows for recovery for all § 6103 violations clearly evidences congressional intent to <u>preempt</u> the FTCA.

[49]28 U.S.C. § 2680(a).

[50]<u>Trevino v. General Dynamics Corp.</u>, 865 F.2d 1474, 1484 (5th Cir.), <u>cert. denied</u>, 493 U.S. 935 (1989).

the discretionary function exception.[51]  If courts were not to exercise restraint, the government would be insulated "from nearly all tort liability,"[52]  thereby frustrating the very purposes that motivated enactment of the FTCA--a classic example of the exception swallowing the rule.

In an exercise of discretion, the IRS has elected to maintain a policy of publishing the names of persons who run afoul of the criminal tax laws.  The avowed purpose of that policy is to deter future violations by all who encounter such publicity.  The district court recognized that the IRS had made an upper-level discretionary decision to disseminate press releases about persons convicted of tax evasion.[53]  The government argues to us that the agents in the instant case were merely carrying out this policy when they released the information about Johnson.  But even if we were to grant that this argument is true as far as it goes, it stops well short of fully addressing the applicability of the discretionary function exception in this case.

The fact that there was an IRS policy to release information about persons convicted of tax evasion does not automatically sterilize every action taken in furtherance of the policy.  This court has stated:

> Once the government makes a discretionary decision, the discretionary function exception does not apply to

---

[51]Collins v. United States, 783 F.2d 1225, 1233 (5th Cir. 1986).

[52]Id.

[53]760 F. Supp. at 1226-27.

27

subsequent decisions made in carrying out that policy, "even though discretionary decisions are constantly made as to how those acts are carried out."[54]

When the government adopts a discretionary policy, it must thereafter exercise constant vigilance to ensure that actions taken in furtherance of that policy are not performed negligently.[55]

In the instant case, we start, as did the district court, with a given:  The IRS, in its discretion, decided to maintain a policy of issuing news releases about persons convicted of tax evasion. In general, that is the kind of policy decision which the discretionary function exception is meant to shield.  When Stone and the other IRS agents here involved published the news release about Johnson, they were ostensibly acting in furtherance of this express policy of the IRS.  Clearly, however, their actions purportedly aimed at implementing the policy were at least negligent because those agents overlooked § 6103--if in fact they did not deliberately ignore it.

Just because the discretionary function exception would generally shield the government from FTCA liability otherwise arising from the policy decision of the IRS to issue such news releases, it does not follow that the government is automatically shielded from such liability when the acts of the particular agents seeking to implement that policy violate another federal law,

---

[54]Trevino, 865 F.2d at 1484 (quoting Wysinger v. United States, 784 F.2d 1252, 1253 (5th Cir. 1986)).

[55]See Payton v. United States, 679 F.2d 475, 479 (5th Cir 1982)(discussing Indian Towing Co. v. United States, 350 U.S. 61 (1955)).

regulation, or express policy. Actions taken to carry out a discretionary policy must be taken with sufficient caution to ensure that, at a minimum, some other federal law is not violated in the process. It goes without saying, then, that if caution must be exercised to avoid simple negligence, even greater caution must be employed to prevent reckless disregard and intentional or deliberate violations of law.

In the instant case, the IRS agents' release of protected information about Johnson was not only negligent in the abstract; it was negligent as a matter of Texas law because a statute--§ 6103--was violated in the course of such conduct. We hold that the discretionary function exception to the FTCA does not shield the government from liability for acts of its agents taken in furtherance of a general discretionary policy--such as the IRS policy to deter tax evasion through the publication of the names and other personal information about tax evaders--when such acts are taken in a manner that violates a federal statute. As the actions in the instant case violated § 6103, which expressly prescribes an applicable standard of diligence, those actions do not qualify for shelter under the wings of the discretionary function exception. The sheltering wings of the exception are broad, but not infinite.

4. <u>Tax Assessment and Collection Exception</u>

The government urges yet another exception to the FTCA's waiver of sovereign immunity, one that purports to eschew governmental liability under the FTCA for "[a]ny claim arising in

29

respect of the assessment or collection of any tax or customs duty."[56] The district court rejected the "[g]overnment's position that any misdeeds committed by the individual defendants in this case . . . were sufficiently related to the assessment or collection of taxes to fall under § 2680(c)."[57]

Again, we review such factual findings for clear error. But even if this issue were one of law, and thus subject to plenary review, we would agree with the district court. To argue that the actions of the IRS officers involved with the Johnson news release were causally connected to the tasks of assessing or collecting taxes strains credulity beyond the breaking point. The government informs us that the purpose of the instant publication effort was to deter potential tax evaders and thus was in furtherance of the more general efforts of the IRS to collect taxes. Therefore, argues the government, publicity aimed at deterring future evasion should be included within the assessment and collection exemption of § 2680(c). We find the government's position untenable.

A determination that the ambit of the assessment and collection exception is so all-embracing as to cover the news releases about Johnson's conviction would extend the exception to the point that the FTCA's waiver of sovereign immunity vis-à-vis the IRS would be wholly subsumed in that exception. Such an extension would effectively exempt every act of every IRS agent whatsoever. No case law cited to this court supports such a

---

[56] 28 U.S.C. § 2680(c).

[57] 760 F. Supp. at 1227.

30

pervasive immunity for the IRS, and we have found none independently.[58] True, the jurisprudence in this area supports the conclusion that the exemption is quite broad as it relates to agents engaged in activities with a realistic nexus to the functions of assessing or collecting taxes. But in the instant case, accepting the government's argument would stretch the assessment and collection exemption to cover all general deterrent activities of the IRS even though, as here, the taxpayer may have long since paid the tax deficiency as well as penalties and interest.

It is axiomatic that not every employee of the IRS is engaged in assessing or collecting taxes even though those are the primary functions and missions of the Service. It is equally true that not every official act of those agents who are thus engaged is sufficiently related to assessing or collecting taxes to have the nexus required to enjoy the protection of § 2680(c). We refuse to expand this exemption as far beyond its already broad range as the government suggests.

In Cappozzoli v. United States, we stated that

> an IRS agent could engage in tortious conduct sufficiently removed from the agents official duties of assessing or collecting taxes as to be beyond the scope of Section 2680(c), and at the same time sufficiently within the scope of his employment to give rise to an action against the United States.[59]

---

[58]See, e.g., Wright v. United States, 719 F.2d 1032, 1035-36 (9th Cir. 1983); Cappozzoli v. Tracey, 663 F.2d 654, 657-58 (5th Cir. 1981).

[59]663 F.2d at 658.

Today we consider just such a situation. Even accepting for the sake of argument that the actions of the subject IRS agents were directed at deterring future tax evasion by others, those actions were not "sufficiently related" to assessing or collecting taxes to be immune from responsibility under § 2680(c). The attenuation of those acts from the outer limits of the exemption is too great to appertain. One of the agents was a publication relations officer; the others were special agents whose jobs comprehend criminal tax violations and violators. Off hand, we can think of no two IRS jobs with less nexus to the functions of assessing or collecting taxes. We are satisfied by the plain language of § 2680(c) that its tax assessment and collection exception was never intended to include deterrent publicity within its ambit of that exemption. We therefore reject the government's exemption argument.

C. Damages

District courts are allowed wide discretion in setting damage awards.[60] Like other fact issues, a district court's assessment of damages is reviewed under the clearly erroneous standard.[61] An appeals court's "reassessment of damages is 'inherently subjective in large part, involving the interplay of experience and emotions

---

[60]Wheat v. United States, 860 F.2d 1256, 1259 (5th Cir. 1988)(citing Wakefield v. United States, 765 F.2d 55, 59 (5th Cir. 1985)); see Fed. R. Civ. P. 52(a).

[61]Id. (citing Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1356 (5th Cir. 1988)).

as well as calculation.'"[62]  A district court's determination of damages cannot be reversed by this court "simply because we would have awarded a lesser sum."[63]  We have recognized that, in reviewing damage awards, appellate courts are well advised to view the award in question within an objective framework--i.e., to compare the award under review to awards in similar cases.[64]  We also have noted, however, that "we cannot determine excessiveness by comparing damage awards and that each case depends on its own facts."[65]

In the instant case, the district court awarded Johnson $10,902.17:  $5,902,117 for economic loss, and $5,000,000 for emotional distress and mental anguish.  We now review each component of the court's award.

1. Economic Damages

The district court awarded Johnson $5,902,117 for the economic loss resulting from his forced resignation.  That loss comprised the following items:

| | |
|---|---|
| Loss of earnings | $ 3,675,917 |
| Loss of pension benefits | 1,524,492 |
| Loss of deferred compensation | 664,208 |
| Loss o[n] sale of Galveston house | 37,500[66] |

---

[62]Sosa v. M/V Lago Izabul, 736 F.2d 1028, 1035 (5th Cir. 1984)(quoting Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983)).

[63]Id. (citing Batchkowsky v. Penn Central Co., 525 F.2d 1121, 1124 (2d Cir. 1975)).

[64]See Wheat, 860 F.2d at 1259.

[65]Id. (citing Wakefield, 765 F.2d at 59).

[66]760 F. Supp. at 1233.

The government does not appeal the quanta of Johnson's losses from either the sale of his Galveston house or his deferred compensation. The government does take the position that Johnson's calculations of his pension losses, which the district court accepted, were erroneous in that they allowed a partial double recovery. We find that position to be well taken.

The loss of earnings was calculated correctly. Johnson's income was properly projected forward, and all salary he received from American National as an employee from the time he returned to Missouri until he attained the age of sixty-five, was properly deducted. The calculation of Johnson's pension, however, was flawed.

Johnson testified that he would have received lifetime pension payments of $11,731 a month had he not been forced to leave his executive position. Instead, he will receive $4858 per month under his current pension--a monthly differential of $6873.[67] He would have been paid this additional money for twelve years (from the age of seventy, his executive retirement age, until the age of eighty-two, the end of his actuarially calculated life expectancy). This yields a gross pension loss of $989,712.[68]

From that gross loss, however, the pension payments that Johnson actually received between the ages of sixty-five and seventy must be subtracted. (As the government properly asserts,

---

[67]Johnson testified that the difference was $7473 per month. This is clearly an arithmetic error, which we will correct.

[68]$6873. x 12(months) x 12(years).

34

Johnson cannot be compensated both for lost wages and as a pensioner during the same five year period.) This deduction equals $291,480,[69] leaving Johnson with lost pension benefits of $698,232 rather than $1,524,492 as accepted by the district court.

This recalculation produces a properly determined economic loss of $5,075,857, not $5,902,117. That amount is $826,260 less than the district court's award.

2. Damages for Emotional Distress and Mental Anguish

The district court's opinion is devoid of information or explanation of the reasoning process or methodology, if any, employed in arriving at its lump sum award of five million dollars as damages for emotional distress and mental anguish. The record contains explicit testimony of the nature of the Johnsons' suffering, as well as discussion by the district court about the effects that the news releases had on Johnson, and the pain and anguish they caused to him and his wife. These negative effects on Johnson's life are well demonstrated by the record of the trial.

Irrespective if all that information, we still have no way of knowing how the district court equated the distress, anguish, and humiliation suffered by the Johnsons with an award of five million dollars. Although that figure might appear to be high, at this juncture we are not prepared either to agree or disagree with its accuracy; we simply have no basis on which to consider the court's determination. Therefore, we remand only this part of the judgment to the district court for verbalization or, if necessary,

---

[69]$4858. x 12(months) x 5(years).

35

recalculation and explanation, of how it arrived at the amount of damages to which Johnson is entitled for emotional distress and mental anguish.

## III

## CONCLUSION

The district court committed no reversible error in finding that the actions of the IRS agents violated § 6103, and that when such a violation of a statute injures persons whose interests are intended to be protected by the statute, the violation constitutes a tort under Texas law, thereby implicating the FTCA. Neither did the court err in rejecting the various exceptions proffered by the government, or in finding that the actionable negligence of the IRS agents in promulgating the two news releases was the proximate cause of the Johnsons' damages. With the exception of Johnson's pension losses--which we have recalculated--the district court's determination of Johnson's special damages are not clearly erroneous. But, as the district court revealed nothing of the method it employed in calculating the Johnsons' damages for emotional distress and mental anguish, we remand this case for the limited purpose of affording that court the opportunity to explain its methodology or, alternatively, to recalculate those damages and explain its recalculation sufficiently to permit appellate review.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part; MODIFIED in part and, as thus modified, RENDERED in part; and REMANDED in part.

36

Garwood, Circuit Judge, Dissenting:


I respectfully dissent.

In my view, Johnson has established neither a cause of action under Texas law, as required by the Federal Tort Claims Act (FTCA),[70] nor that he suffered any material damage as a result of any violation of 26 U.S.C. § 6103 as construed in *Lampert v. United States*, 854 F.2d 335, 338 (9th Cir. 1988), *cert. denied*, 109 S.Ct. 1931 (1989) and *William E. Schrambling Accountancy Co. v. United States*, 937 F.2d 1485, 1488-89 (9th Cir. 1991), *cert. denied*, 112 S.Ct. 956 (1992), a construction which the majority accepts, *arguendo*, as correct.[71]

*This is a federal, not a Texas, law claim*.

The FTCA, subject to diverse exceptions, waives the sovereign immunity of the United States, making it liable in tort "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, for certain damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

---

[70]   28 U.S.C. §§ 1346, 2671-2680.

[71]   Under this construction, section 6103 prohibits "only the disclosure of confidential tax return information" and hence does not prohibit disclosure of return information once that information has been "made a part of the public domain." *Lampert* at 338.  I am in essential agreement with *Lampert*.  *Cf. United States v. Wallington*, 889 F.2d 573, 576 (5th Cir. 1989) (18 U.S.C. § 1905 restricted to confidential information).

employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*"   28 U.S.C. § 1346(b) (emphasis added).   While as a matter of abstract linguistics the phrase "law of the place where the act or omission occurred" might be thought to include generally applicable federal law, it has long been settled that it does not, and that "the liability of the United States under the Act [FTCA] arises only when the law of the state would impose it."   *Brown v. United States*, 653 F.2d 196, 201 (5th Cir. 1981).   Thus, even a violation of the United States Constitution, actionable under *Bivens*,[72] is not within the FTCA unless the complained of conduct is actionable under the local law of the state where it occurred.   *Brown* at 201.

It follows, of course, and has consistently been held, that "the FTCA was not intended to redress breaches of federal statutory duties."   *Sellfors v. United States*, 697 F.2d 1362, 1365 (11th Cir. 1983).   As the Second Circuit said in *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988):

> "The FTCA's 'law of the place' requirement is not satisfied by direct violations of the Federal Constitution, *See Contemporary Mission, Inc. v. U.S.P.S.*, 648 F.2d 97, 104-05 n.2 (2d Cir. 1981); *Birnbaum v. United States*, 588 F.2d 319, 328 (2d Cir. 1978), or of federal statutes or regulations standing alone, *Cecile Indus., Inc. v. United States*, 793 F.2d 97, 100 (3d Cir. 1986); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157-58 (D.C. Cir. 1985); *Birnbaum*, 588 F.2d at 328; *Nichols*, 656 F.Supp. at 1444-45.   The alleged federal violations also must constitute violations of duties 'analogous to those imposed under local law,'

---

[72]   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 91 S.Ct. 1999 (1971).

38

> *Cecile Indus.*, 793 F.2d at 100 (quoting *Art Metal*, 753 F.2d at 1158.)"

*See also, e.g., Zabala Clemente v. United States*, 567 F.2d 1140, 1149 (1st Cir. 1977) (". . . even where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability"); *Gelley v. Astra Pharmaceutical Products, Inc*., 610 F.2d 558, 562 (8th Cir. 1979) (". . . federally imposed obligations, whether general or specific, are irrelevant to our inquiry under the FTCA, unless state law imposes a similar obligation upon private persons").  Our Court has long followed this rule.  *United States v. Smith*, 324 F.2d 622, 624-25 (5th Cir. 1963) (the FTCA "simply cannot apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs" and is unavailable where "[t]he existence or nonexistence of" the claim "depends entirely upon Federal statute"); *Brown; Tindall v. United States*, 901 F.2d 53, 56 at n.8 (5th Cir. 1990) ("a federal regulation cannot establish a duty owed to the plaintiff under state law," citing *Smith*).  *See also Bosco v. U.S. Army Corps of Engineers*, 611 F.Supp. 449, 454 (N.D. Tex. 1985).

This is not to say that the required state law must be one directly applicable to the conduct of federal employees or to the precise activity from which the claim arose.  The Supreme Court made this clear in *Indian Towing Co. v. United States*, 76 S.Ct. 122, 124 (1955), where it relied on the "under like circumstances"

language of section 2674 in holding that the United States could be liable under the FTCA for the Coast Guard's negligence in the operation of its lighthouse, asserting "it is hornbook tort law that one who undertakes to warn the public of a danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *See also Block v. Neal*, 103 S.Ct. 1089, 1092 (1983). Although *Indian Towing* did not expressly refer to state law, subsequent decisions have made plain that in FTCA cases "the application of the 'Good Samaritan' doctrine is at bottom a question of state law." *United States v. S.A. Impresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 104 S.Ct. 2755, 2765 n. 12 (1984). *See also Sheridan v. United States*, 108 S.Ct. 2449, 2455 (1988). If the government undertakes to perform a duty, such as to furnish a lighthouse service or direct air traffic, and negligently performs that duty, then it may be liable under the FTCA *if* a similarly situated private enterprise would be liable under the local law good Samaritan rule. As the Supreme Court explained in *Sheridan*:

> "By voluntarily adopting regulations that prohibit the possession of firearms on the naval base and that require all personnel to report the presence of any such firearm, and by further voluntarily undertaking to provide care to a person who was visibly drunk and visibly armed, the Government assumed responsibility to 'perform [its] "good Samaritan" task in a careful manner.'" *Indian Towing Co. v. United States*, 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955). The District Court and the Court of Appeals both assumed that petitioners' version of the facts would support recovery under Maryland law on a negligence theory if the naval hospital had been owned and operated by a private person." *Id*. at 2555 (footnote omitted).

We have applied the same theory in FTCA cases involving air traffic

40

controllers.  *See Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970).[73]

The teaching of these authorities is that the violation of a federal statute or regulation does not give rise to FTCA liability unless the relationship between the offending federal employee or agency and the injured party is such that the former, if a private (or at least non-federal) person or entity, would owe a duty under state law to the latter in an analogous *non-federal* situation.  If the requisite relationship exists, then the statutory or regulatory violation may constitute or be evidence of negligence in the performance of that analogous state law duty.[74]  But merely because a given state has a general doctrine of negligence *per se* does not mean that every violation there of a federal statute by a federal employee suffices for a claim by an intended statutory beneficiary to be a claim under state law for purposes of the FTCA.  Otherwise, in such states the FTCA would have been rewritten to include conduct actionable only by virtue of federal law where "a private individual under like circumstances" would *not* be liable under state law.  Thus in *Art Metal-U.S.A., Inc. v. United States*, 753

---

[73]     *Gill* was a Texas case.  Texas has recognized the good Samaritan doctrine since well before enactment of the FTCA.  *See, e.g., Colonial Savings Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976).

[74]     Similarly, in an action between private parties who owe a duty one to the other under state law, such as the duties owed by a seller to a buyer in respect to the quality of the goods sold, violation of applicable federal law may constitute a breach of that duty under a negligence per se concept, just as would violation of state law.  *See Gibson v. Worley Mills, Inc.*, 614 F.2d 464, 466 (5th Cir. 1980).

F.2d 1151 (D.C. Cir. 1985), the D.C. Circuit rejected FTCA liability sought to be predicated on a violation of federal regulations, notwithstanding that local law had a broad negligence *per se* doctrine and the plaintiffs were intended beneficiaries of the regulatory provisions violated. The court observed: "duties set forth in *federal* law do not, therefore, automatically create duties cognizable under *local tort law*. The pertinent question is whether the duties set forth in the federal law are analogous to those set forth in local tort law." *Id.* at 1158 (citing *Indian Towing Co.*).[75]  And, in *Sellfors*, an FTCA case sought to be based on a federal statutory violation, the court stated: "We must first reject appellant's insistence upon automatically applying the state negligence *per se* law." *Id.,* 697 F.2d at 1367. The *Sellfors* court went on to say:

> "Even though violation of a federal statutory duty does not automatically invoke state law principles of negligence per se, where the government, in the performance of such duties does act negligently, liability may be found under state law because of the relationship created: the good samaritan doctrine. *See Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)." *Id.*

Where a claim is wholly grounded on violation of a federal statute or regulation, to allow FTCA recovery merely on the basis of a general, abstract state doctrine of negligence *per se*, without requiring that there be some specific basis for concluding that similar conduct by private or non-federal governmental employees in

---

[75]    This language and holding were cited with approval by the Third Circuit in *Cecile Industries, Inc. v. United States*, 793 F.2d 97 at 100 (3d Cir. 1986).

clearly analogous circumstances would be actionable under state law, is to in essence discriminate against the United States: recovery against it is allowed, although in analogous circumstances the private or municipal employer or employee would not be subject to liability under state law. Plainly, the FTCA waiver of sovereign immunity does not go so far.

Here the duty not to disclose return information is grounded entirely on the federal statute, 26 U.S.C. § 6103. Neither the majority, nor the district court, nor the plaintiff-appellee, points to any provision of Texas statutory or common law analogous to section 6103, much less any which in similar circumstances would prohibit a state or municipal official, or a private person, from disclosing information comparable to that disclosed here concerning an individual recently convicted of a felony in the local courts. In its footnote 36 the majority refers, without elaboration or citation of authority, to the torts of libel, slander, and defamation as possible Texas law analogues to the claim made here. However, as the majority recognizes, libel and slander are specifically excluded from the FTCA, 28 U.S.C. § 2680(h), and so presumably is defamation, which is essentially the same thing. Further, the information disclosed here was in every significant respect truthful and a matter of public record. The footnote also makes a similar conclusory reference to professional malpractice arising from the disclosure of confidential information by lawyers or psychiatrists or the like concerning a client or patient. Again, no authority is cited. It seems to me that the analogy is

43

quite strained, as in the instances cited there is a broad and general relationship of trust and confidence voluntarily undertaken between the parties, while the relationship between the Internal Revenue Service and taxpayers is largely involuntary, adversarial, and at arms length. Tellingly, the majority relegates its asserted Texas law analogues to a footnote, and makes no analysis either of the particular elements necessary for recovery under such purported section 6103 analogues or of the facts here to determine whether such particular elements are established. Nor did the district court. It is plain that the majority has relied exclusively on section 6103 (as did the district court), with no justification for doing so beyond the mere fact that Texas has a general doctrine of negligence *per se*.[76] For the reasons previously stated, that simply

---

[76] The majority apparently takes some comfort from the fact that the prohibitions of section 6103(a) extend to certain state and local government employees and, in some specified circumstances, to private persons. Section 6103(a) provides:

> "(a) **General rule**.SQReturns and return information shall be confidential, and except as authorized by this titleSQ
>> (1) no officer or employee of the United States,
>> (2) no officer or employee of any State, any local child support enforcement agency, or any local agency administering a program listed in subsection (*l*)(7)(D) who has or had access to returns or return information under this section, and
>> (3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (e)(1)(D)(iii), (*l*)(12), paragraph (2) or (4)(B) of subsection (m), or subsection (n),
>
> shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise

will not suffice to convert this federal law claim to one under Texas law.

Moreover, the majority does not establish that there actually *is* any Texas law doctrine of negligence *per se* applicable in a case such as this, where the statute violated is a federal one *and* there is also a federal statute that creates a comprehensive federal cause of action for the precise federal statutory violation alleged. As in effect at the time of the here challenged press releases, 26 U.S.C. § 7217 provided as follows:

> "**§ 7217. Civil Damages for unauthorized disclosure of returns and return information**
>
> **(a) General rule.**SQWhenever any person knowingly, or by reason of negligence, discloses a return or return information (as defined in section 6103(b)) with respect to a taxpayer in violation of the provisions of section 6103, such taxpayer may bring a civil action for damages against such person, and the district courts of the United States shall have jurisdiction of any action commenced under the provisions of this section.
>
> **(b) No liability for good faith but erroneous interpretation.**SQNo liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103.
>
> **(c) Damages.**SQIn any suit brought under the provisions of subsection (a), upon a finding of liability on the

---

> or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee."

Obviously, section 6103(a)(1) is the *only* clause applicable to this case. The word "other" in clause (3) plainly excludes federal employees from that clause. But even if section 6103(a)(2) or section 6103(a)(3) applied by analogy, that would be an analogous *federal* law, *not* an analogous *state* law. The majority's discussion of clauses (2) and (3) of section 6103(a) merely serves to confirm that it relies exclusively on federal law.

45

part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum ofSQ

> (1) actual damages sustained by the plaintiff as a result of the unauthorized disclosure of the return or return information and, in the case of a willful disclosure or a disclosure which is the result of gross negligence, punitive damages, but in no case shall a plaintiff entitled to recovery receive less than the sum of $1,000 with respect to each instance of such unauthorized disclosure; and

> (2) the costs of the action.

**(d) Period for bringing action.**SQAn action to enforce any liability created under this section may be brought, without regard to the amount in controversy, within 2 years from the date on which the cause of action arises or at any time within 2 years after discovery by the plaintiff of the unauthorized disclosure."
Added Pub.L. 94-455, Title XII, § 1202(e)(1), Oct. 4, 1976, 90 Stat. 1687, and amended Pub.L. 95-600, Title VII, § 701(bb)(7), Nov. 6, 1978, 92 Stat. 2923. [77]

None of the Texas negligence *per se* cases cited by the majority involve a situation where there is a statutorily created comprehensive cause of action for the statutory violation claimed to constitute negligence *per se*.[78]  It seems to me evident that the

---

[77]    In 1982 section 7217 was repealed and replaced by 26 U.S.C. § 7431, which generally allows for an action against the United States for violations of section 6103.  The legislation repealing section 7217 and enacting section 7431 provided that such legislation would "apply with respect to disclosures made after the date of enactment of this Act [September 3, 1982]."  Pub. L. 97-248, Title III, § 357(c).  Hence, section 7217 remains applicable to the here challenged disclosures, and section 7431 is inapplicable.

[78]    The closest case cited by the majority is *El Chico Corp. v. Poole*, 732 S.W.2d 306 (Tex. 1987).  *Poole* involved suits against licensed on-premises beverage distributors for selling liquor to intoxicated persons contrary to Texas Alcoholic Beverage Code Ann. 101.63(a) (Vernon 1978).  Plaintiffs were individuals injured in collisions during 1984 with cars driven by those to whom the defendants had recently dispensed the alcoholic

46

Texas courts would not create a common law cause of action for the statutory violation in such a situation, particularly where the statute violated is a federal one and the statute creating a comprehensive cause of action for the violation is *likewise* a federal one. Indeed, what could possibly motivate a Texas court to create such a cause of action in those circumstances? If the Texas cause of action merely mirrored section 7217, what purpose would be served?[79] Texas law obviously could not prevent recovery authorized by section 7217. It seems just as plain that Texas could not

beverages in violation of the referenced Texas statute. The Texas Supreme Court handed down its decision on June 3, 1987, holding the defendants civilly liable and relying in part on the doctrine of negligence per se. *Id*., 732 S.W.2d at 312-314. At the time of the complained of acts and injuries, and indeed at the time the Supreme Court's opinion was handed down, no Texas statute spoke to the question whether or under what circumstances there would be civil liability for violation of this or similar provisions of the Texas Alcoholic Beverage Code. The Texas Supreme Court did note, however, that on June 1, 1987, the legislature had passed an amendment to the Texas Alcoholic Beverage Code providing for civil liability if it was apparent to the party furnishing the alcoholic beverage that the person being served was obviously intoxicated to the extent of presenting a clear danger to himself and others. The Supreme Court noted that it was uncertain whether the act would become law, observing that it had not yet been signed by the governor and that its "effectiveness . . . depends upon the action, if any, taken by the Governor." *Id*., 732 S.W.2d at 314. The Court also noted that the legislation apparently placed "a much more onerous burden of proof" on the plaintiff than did the Court's opinion. The Court, however, declined to apply this more onerous standard *because* the legislative amendment "does not by its terms govern a cause of action arising or accruing before its effective date." *Id*. The plain implication of *Poole* is that the statutory cause of action would be exclusive of any court-created action under a negligence *per se* theory with respect to statutory violations occurring after the legislation went into effect.

[79]   Clearly, state as well as federal courts are available for suits under section 7217 itself, as its grant of federal jurisdiction does not purport to be exclusive. *See, e.g., Tafflin v. Levitt*, 110 S.Ct. 792 (1990).

enhance the recovery provided for in section 7217 or authorize such recovery under circumstances in which section 7217 does not allow it.[80]  Any such law would plainly be preempted by section 7217. *See, e.g., Offshore Logistics, Inc. v. Tallentire*, 106 S.Ct. 2485, 2499 (1986); *Mobil Oil Corp. v. Higginbotham*, 98 S.Ct. 2010, 2015 (1978); *Brown v. General Services Administration*, 96 S.Ct. 1961, 1969 (1976); *United States v. Demko*, 87 S.Ct. 382, 383-84 (1966); *Rollins v. Marsh*, 937 F.2d 134, 140 (5th Cir. 1991); *Atkinson v. Gates, McDonald & Co.*, 838 F.2d 808 (5th Cir. 1988); *LeSassier v. Chevron USA, Inc.*, 776 F.2d 506 (5th Cir. 1985).  Here we deal with a suit grounded on the liability of federal employees for actions taken in the course of their employment with the Internal Revenue Service in releasing federal income tax information contrary to section 6103(a)(1) and so as to create civil liability under section 7217.  Clearly in such instances section 7217 must be preemptive of state law.  As the Court remarked in *Boyle v. United Technologies Corp.*, 108 S.Ct. 2510, 2514-15 (1988):  "Another area that we have found to be of peculiarly federal concern, warranting the displacement of state law, is the civil liability of federal officials for actions taken in the course of their duty.  We have held in many contexts that the scope of that liability is

---

[80]    For example, could Texas law allow civil recovery for a section 6103 proscribed disclosure even though it resulted "from a good faith, but erroneous, interpretation of section 6103" and was hence not actionable under section 7217(b)?  Could Texas law authorize a longer limitations period than that of section 7217(d)?  Could Texas law authorize recovery of more than the $1,000 provided for in section 7217(c) absent proof of larger actual damages?

controlled by federal law."

The only reasonable conclusion is that the complained of conduct by the IRS employees here was not, and could not have been, actionable under Texas law; it was, and was only, a violation of section 6103 actionable under section 7217. Because it was not actionable under Texas law, the United States had no liability under the FTCA.

*The section 6103 violation was not a cause of Johnson's damage.*

The majority accepts, *arguendo*, that *Lampert* correctly construes section 6103 and accordingly that the violations here are: the disclosure of Johnson's middle initial "E." (the press releases describe him as "Elvis E. Johnson," while the information uses "Elvis Johnson"); his age (59); the title of his executive position with American National Insurance Company (the press releases say "an executive vice-president for the American National Insurance Corporation," but the trial record refers to him as "an executive for American National Insurance Company"); and his street address (the press releases, which have "Galveston, Texas" headers and use "here" to refer to Galveston, describe Johnson as "of 25 Adler Circle"; the information describes him as "a resident of Galveston, Texas").[81]

---

[81] The information to which Johnson pleaded guilty charged a violation of 26 U.S.C. § 7201, a felony that then provided for a maximum prison term of five years and a $10,000 fine for "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title." The law clearly is, and has been in this Circuit since well before any of the events at issue, that establishing a violation of section 7201 requires a finding

49

The April 17 press release would have been entirely in conformance with section 6103 had it merely omitted the middle initial "E.," the figure "59," and the word "vice-president," while expressly substituting the already clearly implicit "Galveston" for "25 Adler Circle." As so redacted, the press release would read as follows (bracketed material omitted; underscored added):

"INSURANCE EXECUTIVE PLEADS GUILTY IN TAX CASE

GALVESTON, TEXASSSQIn U.S. District Court here, Apr. 10, Elvis [E.] Johnson, [59,] plead guilty to a charge of federal tax evasion. Judge Hugh Gibson sentenced Johnson, of [25 Adler Circle] <u>Galveston</u>, to a six-month suspended prison term and one year supervised probation.

Johnson, an executive [vice-president] for the American National Insurance Corporation, was charged in a criminal information with willful evasion of federal

that the defendant "acted willfully and knowingly with specific intent to evade his income tax obligation," *United States v. Daniels*, 617 F.2d 146, 148 (5th Cir. 1980), and that "a negligent, careless, or unintentional understatement of income" is not "sufficient." *United States v. Garber*, 607 F.2d 92, 97-98 (5th Cir. 1979). "The government must demonstrate that the defendant willfully concealed and omitted from her return income which she knew was taxable." *Id.* at 98.
The information here alleged in relevant part as follows:

". . . on . . . April 15, 1976 . . . the defendant
ELVIS JOHNSON, a resident of Galveston, Texas, did
willfully and knowingly attempt to evade and defeat a
large part of the income tax due and owing by him to
the United States for the calendar year 1975, by
preparing and causing to be prepared, by signing and
causing to be signed, and by mailing and causing to be
mailed, . . . a false and fraudulent income tax return,
which was filed with the Internal Revenue Service,
wherein he stated and represented that his taxable
income for said calendar year was $53,589.00 and that
the amount of tax due and owing thereon was the sum of
$18,374.50, whereas, as he then and there well knew,
his taxable income for 1975 was $59,784.18 upon which
said taxable income he owed to the United States an
income tax of $21,849.47 (Violation: Title 26, United
States Code, Section 7201)."

50

tax by filing a false and fraudulent tax return for 1975.

In addition to the sentence, Johnson will be required to pay back taxes, plus penalties and interest."

There is absolutely no evidence whatever even tending to suggest that such a press release would have had, or was calculated to have had, any different effect on Johnson or his relations with American National Insurance Company than the press releases actually issued.[82] The district court, in effect, simply ignored this problem and treated the *entirety* of the press releases as proscribed under section 6103. Hence the district court's factual finding of causation is grounded on what the majority has assumed is a legally incorrect foundation. The majority (footnote 41) asserts "it was not beyond reason . . . to find that the confidential information that was released caused the damage to Johnson." But no explanation is given for this delphic and wholly counterintuitive conclusion.[83]This was a matter as to which Johnson

---

[82]    While the majority refers, as did the district court, to the fact that Johnson was known as "E.E." to many people, there is no evidence that a reference to "Elvis Johnson, of Galveston, an American National Insurance Company executive," would not have sufficed to identify him. Furthermore, Johnson's damage claims are almost entirely premised on his loss of high position with American National. Yet, it is undisputed that the chief executive officer and general counsel of that concern, as well as a couple of others on its board, were aware, before any press release, that Johnson had pleaded guilty to the information and been sentenced. There is not a scintilla of evidence that *anyone* thought that the addition of the section 6103 confidential (non-public domain) information even had the potential for making any difference at all to anyone with American National (or to anyone else).

[83]    The significant facts were Johnson's identity, his being an executive with American National, and his felony offense, all of which were non-confidential, public domain matters.

had the burden of proof and that burden surely cannot have been sustained by such unreasonable and unexplained speculation.

Nor is this the whole of it. The district court reasoned that because a *minority* of the board knew about Johnson's April 10 guilty plea before any press release, but he was not forced to resign until a few days after the second and last (April 17) release, that therefore the press releases themselves caused him to be terminated. But this is pure post-hoc, propter-hoc reasoning. No one testified that the press releases had *anything* to do with Johnson's loss of position. The district court seems to assume that the board as a whole would not have been told. The majority assumes that there was a change of heart because of the publicity. There is no evidence to support either assumption. Johnson was a member of the board, and the second ranking executive with the company. Only the board could remove him from that position. The fact that a *minority* of the board knew of the April 10 conviction and failed to take action before April 17 proves nothing. Moreover, the evidence is *undisputed* that the whole board and all the stockholders of this large, publicly held company, the stock of which was publicly traded, would have had to have been informed, even if there had never been any press release whatever. Johnson himself testified:

> "Q. At some point you were going to tell the Board that you were a tax felon?
>
> A. It would be in the footnotes of the annual report, sir.
>
> Q. And would have gone out to the board of directors?

52

A.  And to the shareholders.

Q.  And to the shareholders.  And you were going to do that regardless whether there was a press release?

A.  It would have to have been done, yes, sir."[84]

In these circumstances, and on this barren record, it is wholly fanciful to suggest that the inclusion in the press releases of the essentially minor matters whose disclosure was prohibited by section 6103 was a cause of Johnson's loss of position at American National or of any material damage to him.

## *Conclusion*

The majority and the district court recite evidence, principally from Johnson himself, tending to indicate that he wasn't really guilty of felony tax evasion, but was merely negligent at worst, carelessly relying on his wife's confused bookkeeping, and/or that he simply sacrificed himself to protect his wife.  Any such contention is wholly inconsistent with the wording of the information to which Johnson pleaded guilty as well as with the necessary elements of a section 7201 violation.  See footnote 12 *supra*.  In this case Johnson's convictionSQwhich he has never challengedSQwholly bars him from taking any such position, especially in this suit against the United States, which successfully prosecuted him for his tax fraud against it.  *See, e.g., Piper v. United States*, 392 F.2d 462, 464-65 (5th Cir. 1968); *Tomlinson v. Lefkowitz*, 334 F.2d 262, 264-65 (5th Cir. 1964), *cert.*

---

[84]   And we also know as a matter of common knowledge that this information would likewise have to be disclosed to the SEC, where it would be a matter of public record, and to the investment community.

*denied*, 85 S.Ct. 650 (1965). *See also, e.g., United States v. Thomas*, 709 F.2d 968, 972 (5th Cir. 1983). The majority acknowledges that there was no breach of the plea of agreement,[85] but nevertheless it, and the district court, seem to view the matter as if Johnson's legitimate expectations from the agreement were frustrated. Again, however, the conviction stands and Johnson is bound by its necessarily implied findings. He never sought to challenge it. Having received a short, probated sentence for what we must presume was the willful, knowing, and intentional cheating of the United States out of several thousand dollars, and protected by that sentence from more severe punishment, he now collects several million dollars from the United States because this matter of public recordSQwhich he admits all the shareholders of his publicly-held company would have to have been specifically informed of anywaySQwas mentioned in two brief Galveston press releases. Neither the law nor the facts support this recovery. Johnson has indeed made a silk purse from a sow's ear, and we should not countenance it.

---

[85] This is because, as the majority points out (fn. 42), "[t]he plea agreement specified only that the Justice Department would not issue a press release," and there is no finding or conclusive evidence that the Justice Department caused either press release or failed to inform the IRS of the agreement. The majority notes that neither Johnson nor the district court relied on a claim of breach of the plea agreement.